## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KENNETH EUGENE SMITH,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:15-cv-0384-AKK** |
| | ) | |
| **JEFFERSON DUNN, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| **and STEVE MARSHALL, Attorney** | ) | |
| **General, State of Alabama,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## <u>MEMORANDUM OPINION</u>

Kenneth Eugene Smith has petitioned for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 1996 capital murder conviction and death sentence in an Alabama state court. Smith alleges that a variety of constitutional violations require reversal of his conviction and/or sentence. The parties have fully briefed Smith's claims. After careful consideration of the record, the pleadings, and the applicable provisions of 28 U.S.C. § 2254, the court finds that Smith has not shown that he is due an evidentiary hearing on any of his claims, and he is not entitled to habeas relief. Accordingly, Smith's petition is due to be denied.

# I. PROCEDURAL HISTORY

On April 7, 1988, Smith was indicted in the Colbert County Circuit Court on one count of capital murder for the death of Elizabeth Dorlene Sennett. Vol. 1, Tab 3 at 65-66.[1] The indictment charged that Smith intentionally killed Mrs. Sennett by beating her and stabbing her with a knife, for pecuniary consideration of one thousand dollars, in violation of Alabama Code § 13A-5-40(a)(7). *Id*. at 65. After a trial in Jefferson County, Alabama, due to a venue transfer because of "wide publicity in the newspaper, television and radio media," Vol. 40 at 839-40, a jury convicted Smith of capital murder in November 1989. Vol. 1, Tab 3 at 125. The jury recommended a death sentence by a vote of 10 to 2, *id*. at 126, which the trial judge accepted and sentenced Smith to death, *id*. at 130.

The Alabama Court of Criminal Appeals overturned Smith's conviction in 1992, due to a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). *Smith v. State*, 588 So. 2d 561 (Ala. Crim. App. 1991), *on return to remand*, 620 So. 2d 727 (Ala. Crim. App. 1992), *on return to second remand*, 620 So. 2d 732 (Ala. Crim. App. 1992). Smith was retried again in Jefferson County and convicted once again in April

---

[1] References to the record are designated "(Vol. _ )." The court will list any page number associated with the court record by reference to the number in the upper right hand corner of the page, if available. Otherwise, the page number will correspond with the number at the bottom of the page. Additionally, citations to the record will include an easily identifiable tab number close to the cited material where available.

1996. Vol. 1, Tab 2 at 26. This time, the jury recommended by a vote of 11 to 1 a sentence of to life imprisonment without the possibility of parole. Vol. 1, Tab 3 at 114. However, the trial court overrode the jury's recommendation and sentenced Smith to death. *Id.* at 31-37.

The Alabama Court of Criminal Appeals affirmed Smith's conviction and death sentence, and denied his application for rehearing. *Smith v. State*, 908 So. 2d 273 (Ala. Crim. App. 2000). The Alabama Supreme Court initially granted Smith's certiorari petition on June 4, 2003, but subsequently quashed the writ, as having been improvidently granted. *Ex parte Smith*, 908 So. 2d 302 (Ala. 2005). The United States Supreme Court denied Smith's petition for a writ of certiorari. *Smith v. Alabama*, 546 U.S. 928 (2005).

Smith timely filed a Rule 32 petition in the Jefferson County Circuit Court to vacate his conviction and sentence, Vol. 31, Tab 55 at 245-328, and amended the petition three months later, Vol. 32, Tab 57 at 428-520. The state responded, Vol. 36, Tab 74, and, in September 2007, the trial court entered a joint consent order setting a schedule for discovery, for the filing of additional pleadings, and for a status conference, Vol. 32, Tab 59. The court indicated that it would enter a schedule for discovery and an evidentiary hearing after it ruled on Smith's discovery motion and the state's motion for partial dismissal. Vol. 32, Tab 59 at 529. Smith then filed a

motion for discovery, Vol. 32, Tab 60, and the state filed a motion for partial dismissal, seeking summary disposition of many of the claims raised in the amended petition, Vol. 32, Tab 61. Thereafter, the state responded to Smith's motion for discovery,[2] and Smith filed an opposition to the motion for partial dismissal. Vol. 32, Tab 63 at 588 - Vol. 33 at 617; Vol. 32, Tab 62. Ultimately, the trial court denied Smith's motion for discovery and summarily denied his Rule 32 petition, Vol. 30, Tab 51 and Tab 52 at 9-55, and subsequently denied Smith's motion for reconsideration, Vol. 33, Tab 64 at 620-30; Vol. 33, Tab 65 at 667-69. On December 17, 2010, the Alabama Court of Criminal Appeals reversed the trial court and remanded the case to the trial court to address the allegations in Smith's amended Rule 32 petition.[3] *Smith v. State*, 160 So. 2d 40 (Ala. Crim. App. 2010).

On remand, Smith filed a motion for discovery and an evidentiary hearing, Vol. 37, Tab 76 at 346-79, and the trial court granted the motion for discovery, Vol. 36, Tab 72 at 102-03. The trial court also entered an order directing Smith to "elaborate further" on several of his claims, and allowing him to "submit any affidavits that he may choose in support of each of his claims . . . in lieu of testimony in support of"

---

[2] In its response, the state acknowledged that Smith was entitled to discovery of many of the documents he requested. Vol. 32, Tab 63 at 588 - Vol. 33 at 617

[3] In its order summarily denying the Rule 32 petition, the trial court addressed the claims in Smith's original Rule 32 petition rather than the claims in the amended petition.

those claims. Vol. 36, Tab 72 at 100-01. Smith complied, and filed a memorandum elaborating on his claims, along with four affidavits and numerous exhibits. Vol. 38, Tab 78 - Vol. 39, Tab 82. Thereafter, the state responded to Smith's request for an evidentiary hearing and the memorandum, Vol. 37, Tab 75, and Smith filed a reply further elaborating on his claims, Vol. 40, Tab 84. The trial court issued its return to remand, again denying Smith's petition. Vol. 36, Tab 73 at 104-48.

On February 10, 2012, the Court of Criminal Appeals remanded the case again "because the trial court failed to comply with Rule 32.9, Ala. R. Crim. P., when it summarily dismissed some of the claims on which it had already permitted Smith to present evidence." *Smith v. State*, 160 So. 3d 40, 53 (Ala. Crim. App. 2012). The court directed the trial court to "make specific findings relating to each material issue of fact presented on those claims involving the hair and the afghan on which the trial court permitted Smith to present evidence." *Id*. at 54. And, in response, the trial court issued its second return to remand, again denying the relief. Vol. 43, Tab 90. The Court of Criminal Appeals found that the trial court had made adequate fact findings as to one of the three claims, but not to the other two, and remanded the case again. Vol. 43, Tab 94.

On December 12, 2012, the trial court issued its third return to remand on the remaining claims. Vol. 43, Tab 96. The Court of Criminal Appeals affirmed the trial

court, Vol. 44, Tab 100, and overruled Smith's application for rehearing, Vol. 45, Tab 102.

After the Alabama Supreme Court denied Smith's petition for writ of certiorari, Vol. 46, Tab 104, Smith filed a § 2254 petition in this court. Doc. 1. Thereafter, Respondents filed an answer and brief, docs. 21, 25, and Smith replied, doc. 31.

## II. THE OFFENSE OF CONVICTION

In its opinion on direct appeal, the Court of Criminal Appeals summarized the evidence in the case:

> The State's evidence tended to show the following. On March 18, 1988, the Reverend Charles Sennett, a minister in the Church of Christ, discovered the body of his wife, Elizabeth Dorlene Sennett, in their home on Coon Dog Cemetery Road in Colbert County. The coroner testified that Elizabeth Sennett had been stabbed eight times in the chest and once on each side of the neck, and had suffered numerous abrasions and cuts. It was the coroner's opinion that Sennett died of multiple stab wounds to the chest and neck.

> The evidence established that Charles Sennett had recruited Billy Gray Williams, who in turn recruited Smith and John Forrest Parker, to kill his wife. He was to pay them each $1,000 in cash for killing Mrs. Sennett. There was testimony that Charles Sennett was involved in an affair, that he had incurred substantial debts, that he had taken out a large insurance policy on his wife, and that approximately one week after the murder, when the murder investigation started to focus on him as a suspect, Sennett committed suicide. Smith detailed the following in his confession to police:

>> About one month prior to March 18, 1988, I was contacted by Billy Williams. Billy came over to my house

and we talked out on the front porch. It was late afternoon. Billy said that he knew someone that wanted somebody hurt. Billy said that the person wanted to pay to have it done. Billy said the person would pay $1500 to do the job. I think I told Billy I would think about it and get back with him. Billy lives at the corner of Tuscaloosa Street and Cypress Street near the telephone company. Billy drives a red and white Thunderbird. Billy and I are good friends. Billy and I talked about this several times before I agreed to do it. I had already talked with John Parker about helping me.

I think I first met Charles Sennett about two weeks prior to the murder. Billy arranged the meeting. At the time I met Mr. Sennett I did not know who he was. I did not ask his name and he did not ask what my name was. Mr. Sennett told me that he wanted somebody taken care of. Mr. Sennett said that the person would be at home, that they never had any visitors. Mr. Sennett said that the house was out in the country. At that time I just listened to his proposal and told him I would get back with him. When we talked we sat in Mr. Sennett's truck in front of Billy's apartment. I gave him my phone number.

Mr. Sennett called me a couple of times to see if I had made a decision. Sometime between the Monday prior to the murder and the Thursday prior to the murder, Mr. Sennett learned that John and I would do what he wanted. I met with Mr. Sennett on Tuesday prior to the murder in the coffee[house] at ECM. At this meeting Mr. Sennett drew me a diagram of his house and told me that his wife and he would be out of town on Wednesday, to go down to the house and look around. By the time Sennett and I met at ECM I had learned through conversations with him that it was his wife that he wanted killed and the price agreed was $1,000 each – excuse me – $1,000 each for Billy Williams, John Parker and I.

The next meeting was on Thursday prior to the murder in front of Billy's apartment again. Billy, Mr. Sennett and I sat in Mr. Sennett's silver car and talked. I don't recall what time it was exactly. I think it was in the morning. At this meeting Sennett gave me $200 and showed us the rest of the money. Two hundred dollars was for anything we needed to do the job. John Parker sat in my car while Billy and I talked with Mr. Sennett. The murder was supposed to look like a burglary that went bad. This was Mr. Sennett's idea. Sennett told me to take whatever I wanted from the house. It was agreed for John and I to do the murder and then come back to Billy's apartment – to Billy's house – excuse me – and get the rest of our money. This meeting only lasted a short while. Sennett told us that he would be gone from 8:30 until noon. Then on 3/18 of '88 . . . Friday, John and I got together around 8:30. We were in John's car, a Pontiac Grand Prix, gold. John drove to Muscle Shoals, then I drove down to the Sennett house. John had brought a black handle survival knife and a black holster. At this time we still did not know how we were going to kill Mrs. Sennett.

John and I got to the Sennett house around 9:30, I think. I parked at the back of the house near a little patio that led into the house. I went to a door to the left of the car. I think there was a white freezer nearby. I knocked on the door and Mrs. Sennett came to the door. I told Mrs. Sennett that her husband had told us that we could come down and look around the property to see about hunting on it. Mrs. Sennett asked my name. I told her I was Kenny Smith. She went to the phone and called her husband and came back and told us it was okay to look around.

John and I looked around the property for a while then came back to the house. John and I went back to the door. We told Mrs. Sennett we needed to use the bathroom and she let us inside.

I went to the bathroom nearest the kitchen and then John went to the bathroom. I stood at the edge of the kitchen talking with Mrs. Sennett. Mrs. Sennett was sitting at a chair in the den. Then I heard John coming through the house. John walked up behind Mrs. Sennett and started hitting her. John was hitting her with his fist. I started getting the VCR while John was beating Mrs. Sennett. John hit Mrs. Sennett with a large cane and anything else he could get his hands on. John went into a frenzy. Mrs. Sennett was yelling just stop, we could have anything we wanted.

As John was beating up Mrs. Sennett, I messed up some things in the house to make it look like a burglary. I took the VCR out to the car.

The last place I saw Mrs. Sennett she was lying near the fireplace covered with some kind of blanket. I had gone outside to look in the storage buildings when I saw John run out to the pond and throw some things in it. I also took a small stereo from the house – "also," is the last word.

I don't know what brand it was or where in the house I got it. The VCR was a Samsung. I got it from under the TV set in the den. When John got back to the car we drove back to Billy's apartment to get our money.

On the way back John told me that he had stabbed her once in the neck. I never stabbed Mrs. Sennett at all. When John and I got to Billy's, we were given $900 a piece. Billy gave us the money.

At the time of the murder I never [knew] Charles Sennett's name or his wife's. It was only when it came out in the newspaper that I learned the name of the lady that was killed and Charles Sennett.

I took the Samsung VCR home with me. The last time I saw the stereo it was in John's car. It was around noon when we got to Billy's apartment. Then on 3/31/88 – . . . Thursday – my house was searched by investigators and they found the VCR. I was brought to the Colbert County Courthouse where I was advised of my rights. After being advised of my rights, I gave Investigator May this written statement.

Smith's statement to police was corroborated at trial. Donald Buckman, a friend of Smith's, testified that Smith approached him about one week before the murder and asked him if he would be interested in participating in beating someone up in exchange for money. Another witness, Brent Barkley, testified that Smith told him that he had been hired to beat up someone. Barkley also stated that he saw Smith on the evening of the murder and that Smith's hand was "bruised and wrapped." There was also testimony that Smith had in his possession a large amount of money immediately after the murder.

Smith's defense at trial was that he participated in the assault of Elizabeth Sennett but that he did not intend to kill her. Counsel in opening statement stated the following:

[Smith] agreed with Sennett to go beat Elizabeth Dorlene Sennett, to rough her up, to make it look like a robbery for fast cash. That is the terms they used. It was not to kill Mrs. Sennett. It was not to take her life. As shameful and as vile, it was nothing more or nothing less than to beat her up and to take [sic]. And that plan, what they agreed to – and you will hear evidence of this – that as evil as that plan was, that is all it was.

*Smith*, 908 So. 2d at 279-81 (alterations in original) (footnotes omitted).

## III.  THE SENTENCE

The trial court issued a sentencing order immediately following the sentencing hearing. Vol. 1, Tab 3 at 31-37.  Thereafter, the trial court amended the sentencing order to set "out the things that the Court considered in sentencing the defendant" and "refine" the sentencing order, noting that:

> The Court considering the aggravating circumstances as set out and enumerated in § 13A-5-49 of the Code of Alabama, as amended:

> (A) the Court finds from the evidence introduced at the trial and re-introduced at the punishment hearing before the jury that the defendant, Kenneth Eugene Smith, committed the murder for pecuniary gain, namely for the sum of $1,000. The court finds that said defendant was, in fact, paid that sum for said intentional killing. The court finds that this is an aggravating circumstance pursuant to § 13A-5-49(6) of the Code of Alabama, as amended, and the Court has considered said aggravating circumstance.

> The Court finds that the defendant was not a person under sentence of imprisonment; therefore, the Court does not consider the aggravating circumstance listed in Section 13A-5-49(1), Code of Alabama, the Court finding that said aggravating circumstance does not exist in this case.

> The Court finds the defendant was not previously convicted of another capital murder, nor previously convicted of a felony involving the use or threat of violence to the person; therefore, the Court does not consider the aggravating circumstance listed in Section 13A-5-49(2), Code of Alabama, the Court finding that said aggravating circumstance does not exist.

> The Court finds that the defendant did not knowingly create a great risk of death to many persons, therefore, the Court does not

consider the aggravating circumstance listed in Section 13A-5-49(3), Code of Alabama, the Court finding that said aggravating circumstance does not exist.

The Court finds that this offense was not committed while the defendant was engaged or was an accomplice in the commission of or an attempt to commit, or flight after committing, or attempting to commit rape, robbery, burglary or kidnapping, therefore, the Court does not consider the aggravating circumstance listed in Section 13A-5-49(4), Code of Alabama, the Court finding that said aggravating circumstance does not exist.

The Court does not find that the offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, therefore the Court does not consider the aggravating circumstance listed in Section 13A-5-49(5), Code of Alabama, the Court finding that said aggravating circumstance does not exist.

The Court does not find that the offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; therefore, the Court does not consider the aggravating circumstance listed in Section 13A-5-49(7), Code of Alabama, the Court finding that said aggravating circumstance does not exist.

The Court does not find that the offense was especially heinous, atrocious or cruel compared to other capital offenses, therefore the Court does not consider the aggravating circumstance listed in Section 13A-5-49(8), Code of Alabama, the Court finding that said aggravating circumstance does not exist.

(B) The Court now proceeds to consider the mitigating circumstances as set out and enumerated in § 13A-5-51 of the Code of Alabama, as amended, and other mitigating circumstances proved at the punishment hearing before the jury.

The Court finds 2 statutory mitigating circumstances in this cause and that is the age of the defendant at the time of the commission of the crime in that he was 22 years of age. However, the Court does find from the evidence that the defendant was normal and not retarded, had attended high school and worked several jobs, was married and had one (1) minor child.

The Court further finds that the defendant had no significant history of prior criminal activity.

The Court further finds as to a non-statutory mitigating certain factors, that the defendant appeared to be remorseful for what he had done, and he gave a voluntary confession. However, the defendant did not turn himself in to the police and at the time of his arrest in his home in Florence, Alabama, there was found in his home a VCR that was the property of the victim with blood still on it.

The Court further finds as a non-statutory mitigating [factor], the defendant's good conduct in jail; and in counseling others including family members.

During his tenure in the Colbert County Jail, Tuscumbia, Alabama, he warned a jail-guard of an impending breakout of jail by other inmates. The jail-guard, Alton Hankins, testified to this. While in prison with the Board of Corrections, he has adjusted and upgraded his education and counseled other people.

The Court further finds as a non-statutory mitigating factor that the defendant was neglected and deprived in his early childhood.

The Court further finds that the capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance, accordingly the Court does not consider the mitigating circumstance listed in Section 13A-5-51(2), Code of Alabama, the Court finding that said mitigating circumstance does not exist in this case.

The Court further finds from the evidence that the victim was not a participant in the defendant's conduct or consented to it; therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51(3), Code of Alabama, does not exist and the Court does not consider it.

The Court does not find from the evidence that the defendant was an accomplice in a capital offense committed by another person and that his participation was relatively minor. The Court finds from the evidence in this case that the defendant, Kenneth Eugene Smith, and John Forrest Parker both killed the victim by beating and hitting her with different objects and stabbing her while the victim was pleading with them. Therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51(4), Code of Alabama, does not exist and the court does not consider it.

The Court does not find from the evidence that the defendant acted under extreme duress or under the substantial domination of another person; therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51(5), Code of Alabama, does not exist and the Court does not consider it.

The Court does not find from the evidence that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; the Court had evidence before it regarding the defendant's actions during and after the murder of Elizabeth Dorlene Sennett which demonstrate[s] that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired. The defendant's actions in throwing away the murder weapons after the killing, his attempting to make it look like a burglary, and other evidence that was presented, is all evidence that the defendant at the time in question appreciated that his conduct was criminal, and that he might be apprehended and for that reason did what he could to avoid apprehension. Accordingly, the Court finds that the mitigating circumstance listed in Section 13A-5-51(6), Code of Alabama, does not exist and the Court does not consider it.

The Court does find that the jury's recommendation is a mitigating factor and the Court has consider[ed] said mitigating factor at this sentence hearing. However, the jury was allowed to hear an emotional appeal from the defendant's mother. The Court does not find that the defendant's problems during his childhood is a mitigating factor.

Also, there was evidence presented to the jury that the husband of the victim was the instigator of the killing of his wife, but the fact that the victim's husband conspired with the defendant and his co-defendants to kill his wife does not make this defendant any less culpable and is not a mitigating factor.

The Court has also considered the Presentence Investigation Report as set out in Section 13A-5-47, Code of Alabama, as amended, in determining a sentence in this cause.

The Court having considered the aggravating circumstances and the mitigating circumstances, finds that the aggravating circumstances due to the nature of the crime and the defendant's involvement in it outweighs the mitigating circumstances presented, and the mitigating factor that the jury recommended a sentence of life without parole and the vote was eleven (11) for life and one (1) for death.

The Court does find that there is a reasonable basis for enhancing the jury's recommend[ed] sentence for the reasons stated herein that this was a murder for hire and the defendant had the opportunity to reflect and withdrawn [sic] from his actions and chose not to do this; he was paid for his actions; that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired. Therefore, on this 21st day May, 1996, with the defendant, Kenneth Eugene Smith being present, and having been convicted by a jury of capital murder and the Court having weighed the aggravating circumstances against the mitigating circumstances and factors, and the Court having found that the aggravating circumstances outweigh the mitigating circumstances and factors;

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** by the Court, and it is the judgment of the Court, and the sentence of law that the defendant, Kenneth Eugene Smith, suffer death by electrocution. The Sheriff of Jefferson County, Alabama is directed to deliver Kenneth Eugene Smith to the custody of the Director of the Department of Corrections and the designated executioner shall, at the proper place for execution of one sentenced to suffer death by electrocution, cause a current of electricity of sufficient intensity to cause death in the application and continuance of such current to pass through the said Kenneth Eugene Smith until the said Kenneth Eugene Smith is dead. May God have mercy on you!

**DONE AND ORDERED** this 25th day of September, 1997.

Vol. 6, Tab 4 at 1092-97.

## IV. THE SCOPE OF FEDERAL HABEAS REVIEW

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). As such, this court's review of claims seeking habeas relief is limited to questions of federal constitutional and statutory law. Claims that turn solely upon state law principles fall outside the ambit of this court's authority to provide relief under § 2254. *See Alston v. Department of Corrections*, 610 F. 3d 1318, 1326 (11th Cir. 2010).

## A. Exhaustion of State Court Remedies: The First Condition Precedent to Federal Habeas Review

A habeas petitioner is required to present his federal claims to the state court and to exhaust all of the procedures available before seeking relief in federal court. 28 U.S.C. § 2254(b)(1); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005). That requirement ensures that state courts are afforded the first opportunity to address federal questions affecting the validity of state court convictions and, if necessary, correct violations of a state prisoner's federal constitutional rights. As the Eleventh Circuit has explained:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies. . . .
>
> Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted). The Supreme Court has written these words:
>
>> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.
>
> *Picard*, 404 U.S. at 275, 92 S. Ct. at 512. . . .

Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

## B.  The Procedural Default Doctrine: The Second Condition Precedent to Federal Habeas Review

### 1.  General principles

It is well established that if a habeas petitioner fails to raise his federal claim in the state court system at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits. Stated differently, "the petitioner will have procedurally defaulted on that claim."[4] *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2009). Generally, if the last

---

[4]The so-called "procedural default" doctrine states as follows:

In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default "are similar in purpose and design and implicate similar concerns," *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 7 (1992). *See also Coleman v. Thompson*, 501 U.S. 722, 731–732, 111 S. Ct. 2546 (1991). In habeas, state-court remedies are described as having been "exhausted" when they are no longer available, regardless of the reason for their unavailability. *See Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, *ibid.*, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. *Id.*, at 162, 116 S. Ct. 2074;

state court to examine a claim states clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules, and that procedural bar provides an adequate and independent state ground for denying relief, then federal review of the claim also is precluded by federal procedural default principles. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Cone v. Bell*, 556 U.S. 449, 465 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review."). And, the Supreme Court defines an "adequate and independent" state court decision as one that "rests on a state law ground that is *independent* of the federal question and adequate to support the judgment." *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)) (emphasis in *Lee*). The questions of whether a state procedural rule is "independent" of the federal question and "adequate" to support the state court's judgment, so as to have a preclusive effect on federal review of the claim, "is itself a federal question." *Id*. (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

---

*Coleman*, *supra*, at 744–751, 111 S. Ct. 2546.

*Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006).

To be considered "independent" of the federal question, "the state court's decision must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). An example of intertwining would be when "the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed." *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). Stated differently, if "the state court must rule, either explicitly or implicitly, on the merits of the constitutional question" before applying the state's procedural rule to a federal constitutional question, then the rule is not independent of federal law. *Id*.

To be considered "adequate" to support the state court's judgment, the state procedural rule must be both "firmly established and regularly followed." *Lee v. Kemna*, 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). The rule must be "clear [and] closely hewn to" by the state for a federal court to consider it as adequate. *James*, 466 U.S. at 346. That does not mean that the state's procedural rule must be rigidly applied in every instance, or that occasional failure to do so will render the rule inadequate. "To the contrary, a [state's] discretionary [procedural] rule can be 'firmly established' and 'regularly followed' – even if the appropriate exercise

of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 52, 60-61 (2009). The adequacy requirement means only that the procedural rule "must not be applied in an *arbitrary or unprecedented fashion*." *Judd*, 250 F.3d at 1313 (emphasis added).

Thus, in summary, if the procedural rule is not firmly established, or if it is applied in an arbitrary, unprecedented, or manifestly unfair fashion, it will not be considered adequate, and the state court decision based upon such a rule can be reviewed by a federal court. *Card*, 911 F.2d at 1517. Conversely, if the rule is deemed adequate, the decision will not be reviewed by this court.

### 2. Overcoming procedural default

Generally, there are three circumstances in which an otherwise valid state-law ground will *not* bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court: (1) where the petitioner demonstrates that he had good "cause" for not following the state procedural rule, and, that he was actually "prejudiced" by the alleged constitutional violation; or (2) where the state procedural rule was not "firmly established and regularly followed"; or (3) where failure to consider the petitioner's claims will result in a "fundamental miscarriage

of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring).[5]

### a.     The "cause and prejudice" standard

"A federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)) (emphasis added). This so-called "cause and prejudice" standard is framed in the conjunctive, and a petitioner must prove both parts.

### i.     "Cause"

To show "cause," a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in the state courts. *Carrier*, 477 U.S. at 488. "Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule

---

[5]*See, e.g., Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (citations omitted).

impracticable, and 'a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (citations omitted). And, while "[a]ttorney error [on direct review] that constitutes ineffective assistance of counsel" has long been accepted as "cause" to overcome a procedural default, the constitutional ineffectiveness of post-conviction counsel on collateral review generally will not support a finding of cause and prejudice to overcome a procedural default. *Coleman*, 501 U.S. at 754. This is the case because "[t]here is no right to counsel in state post-conviction proceedings." *Id*. at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989)).[6]

### ii.    "Prejudice"

A habeas petitioner must show also that he was actually "prejudiced" by the alleged constitutional violation. This entails showing  "not merely that the errors at

---

[6]But, in two recent landmark cases, the Supreme Court extended *Coleman* by deciding that, as a matter of equity, and, under specific, limited circumstances, errors by counsel on post-conviction collateral review could establish the necessary "cause" to overcome a procedurally defaulted claim. In the first such case, *Maples v. Thomas*, 565 U.S. 266 (2012), the Court found that post-conviction counsel's gross professional misconduct (e.g., abandonment of the petitioner) severed the agency relationship between counsel and the petitioner and, thus, established the necessary "cause" to overcome a procedural default. *Id*. at 281. And, in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Court held that post-conviction counsel's failure to raise an ineffective assistance of trial counsel claim at an initial review collateral proceeding could serve as the necessary "cause" to overcome the procedural default of that type of claim when the state prohibits it from being raised during the direct review process. *Id*. at 11-12.

his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis added). If the "cause" is of the type described in *Martinez v. Ryan*, then the reviewing court should consider whether the petitioner can demonstrate "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 12-15 (citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)).

### b.    The "fundamental miscarriage of justice" standard

In a "rare," "extraordinary," and "narrow class of cases," a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the default if *either*: (a) a fundamental miscarriage of justice "has probably resulted in the conviction of one who is actually innocent," *Smith*, 477 U.S. at 537-38 (quoting *Carrier*, 477 U.S. at 496); or (b) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty," *Schlup*, 513 U.S. at 323-27 & n.44 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

**C.      The Statutory Overlay: The Effect of the Antiterrorism and Effective Death Penalty Act of 1996 on Habeas Review**

The writ of habeas corpus "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That is especially true when federal courts are asked to engage in habeas review of a state court conviction pursuant to 28 U.S.C. § 2254, where "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Id.* (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)). "Those few who are ultimately successful [in obtaining federal habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963). "Accordingly, . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634.

Congress legislated these principles in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended preexisting habeas law,[7] and

_____

[7] Smith filed his petition after AEDPA became law. *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996). Accordingly, the habeas statutes as amended by AEDPA apply to the claims asserted in this case. *See Id.* § 107(c), 110 Stat. at 1226; *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to habeas petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same). *See also Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254).

included several provisions requiring federal courts to give even more deference to state court determinations of federal constitutional claims.

### 1.     28 U.S.C. § 2254(e)(1)

Section 2254(e)(1) requires district courts to presume that a state court's factual determinations are correct, unless the habeas petitioner rebuts the presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Section 2254(e)(1) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). The deference that attends state court findings of fact pursuant to § 2254(e)(1) applies to all habeas claims, regardless of their procedural stance. Thus, a presumption of correctness must be afforded to a state court's factual findings, even when the habeas claim is being examined *de novo*. *See Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1313 (11th Cir. 2012). And, the presumption of correctness also applies to habeas claims that were adjudicated on the merits by the state court and, therefore, those claims are subject to the standards of review set out in 28 U.S.C. § 2254(d)(1) or (d)(2) discussed in the following section.

## 2.    28 U.S.C. § 2254(d)

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). It does not matter whether the state court decision contains a lengthy analysis of the claim, or is a summary ruling "unaccompanied by explanation." *Id.* Further, the "backward-looking language" of the statute requires an examination of the state court decision on the date rendered. *Cullen v. Pinholster*, 563 U.S. 170 (2011). That is, "[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Id*. at 182 (quoting *Lockyer v. Andrade*, 588 U.S. 63, 71-72 (2003)). Finally, "review under § 2254(d)(1) [and (d)(2)] is limited to the record that was before the state court that adjudicated the claim on the merits," *id*. at 181, and a federal habeas court conducting 2254(d) review should not consider new evidence "in the first instance effectively *de novo*," *id*. at 182.

A closer look at the separate provisions of 28 U.S.C. § 2254(d)(1) and (d)(2) reveals that when a state court has made a decision on a petitioner's constitutional claim, habeas relief cannot be granted unless it is determined that the state court's adjudication of the claim either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[8] The "contrary to" and "unreasonable application" clauses of § 2254(d) are "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams*, 529 U.S. at 405-07).[9] When considering a state court's adjudication of a petitioner's claim, therefore, the habeas court must not conflate the two.

### a.     The meaning of § 2254(d)(1)'s "contrary to" clause

---

[8] Section 2254(d)(1)'s reference to "clearly established federal law, as determined by the Supreme Court of the United States" has been interpreted by the Supreme Court as referencing only "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412 (O'Connor, J., majority opinion) (emphasis added); *see also, e.g., Carey v. Musladin*, 549 U.S. 70, 74 (2006) (same); *Osborne v. Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006) (same); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

[9] *See also Williams*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) '*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) '*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.'") (emphasis added).

A state court determination can be "contrary to" clearly established Supreme Court precedent in at least two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405. *See also, e.g., Brown v. Payton*, 544 U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (same); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same). But, as the Eleventh Circuit has noted, the majority opinion in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples set forth above. Instead, the statutory language "simply implies that 'the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court.'" *Alderman*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405).

### b. The meaning of § 2254(d)(1)'s "unreasonable application" clause

A state court's determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407. But, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410 (emphasis in original). A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously or incorrectly*. Rather, that application must also be unreasonable." *Id.* at 411 (emphasis added). In other words, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable," and not whether the state court "correctly" applied Supreme Court precedent *Id*. at 409.[10]

To demonstrate that a state court's application of clearly established federal law was "objectively unreasonable," the habeas petitioner "must show that the state

_____

[10] *See also, e.g., Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable," and stating that "an unreasonable application is different from an incorrect one"); *Harrington v. Richter*, 562 U.S. 86, 100-103 (2011) (same).

court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Stated another way, if the state-court's resolution of a claim is debatable among fairminded jurists, it is not objectively unreasonable.

        c.       **The meaning of § 2254(d)(2)'s clause addressing an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding"**

      Title 28 U.S.C. § 2254(d)(2) "imposes a 'daunting standard – one that will be satisfied in relatively few cases.'" *Cash v. Maxwell*, 565 U.S. 1138, 132 S. Ct. 611, 612 (2012) (Sotomayor, J., respecting denial of certiorari) (quoting *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010)). As the Supreme Court has noted,

> in related contexts, "[t]he term 'unreasonable' is no doubt difficult to define." *Williams v. Taylor*, 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Cf. Id.*, at 411, 120 S. Ct. 1495.

*Wood v. Allen*, 558 U.S. 290, 301 (2010). Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)) (alteration in original). Conversely,

"when a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Correctional Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (*en banc*)).

### d. Evaluating state court factual determinations under 28 U.S.C. § 2254(d)(2) and (e)(1)

As set out previously, 28 U.S.C. § 2254(d)(2) regulates federal court review of state court findings of fact. That provision limits the availability of federal habeas relief on any claims that are grounded in a state court's factual findings, unless the findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Moreover, § 28 U.S.C. § 2254(e)(1) provides that factual determinations made by a state court are "presumed to be correct," and that the habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1). But, "no court has fully explored the interaction of § 2254(d)(2)'s 'unreasonableness' standard and § 2254(e)(1)'s 'clear and convincing evidence' standard." *See Cave v. Sec'y, Dep't of Corr.*, 638 F.3d 739, 744-45 (11th

Cir. 2011) (quoting *Gore v. Sec'y, Dep't of Corr.*, 492 F.3d 1273, 1294 n.51 (11th Cir. 2007)). Still, federal habeas courts "must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." *Ward v. Hall*, 592 F.3d 1144, 1177 (11th Cir. 2010) (citing § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001)). And, § 2254(e)(1) "commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155 (alteration in original).

## D.    The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Federal habeas "exists only to review errors of constitutional dimension." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). Further, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Two consequences flow from those fundamental propositions: (1) the habeas petitioner bears the burden of overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and of establishing a factual basis demonstrating that

federal post-conviction relief should be granted,[11] and (2) the habeas petitioner must meet "heightened pleading requirements."[12] The mere assertion of a ground for relief, without sufficient factual detail, does not satisfy either the petitioner's burden of proof under 28 U.S.C. § 2254(e)(1), or the requirements of Rule 2© of the *Rules Governing Section 2254 Cases in the United States District Courts*, which requires a state prisoner to "specify all the grounds for relief available to the petitioner," and to then "state the facts supporting each ground." Rule 2(c)(1) and (2), *Rules Governing Section 2254 Cases in the United States District Courts*. *See also* 28 U.S.C. § 2242 (stating that an application for writ of habeas corpus "shall allege the facts concerning the applicant's commitment or detention").

In short, a habeas petitioner must include in his statement of each claim sufficient supporting facts to justify a decision for the petitioner if the alleged facts are proven true. *See, e.g., Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (observing that a habeas petition must "state facts that point to a 'real possibility of constitutional error'") (quoting Advisory Committee Notes to Rule 4 of the *Rules Governing Section 2254 Cases in the United States District Courts*). In addition,

---

[11]*See, e.g.*, 28 U.S.C. § 2254(d) and (e)(1); *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) ("The burden of proof in a habeas proceeding is always on the petitioner.") (citing omitted).

[12]*McFarland v. Scott*, 512 U.S. at 856; *Borden v. Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (holding that Section 2254 requires "fact pleading," and not merely "notice pleading").

"[c]itation of the controlling constitutional, statutory, or other bases for relief for each claim also should be stated." 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 11.6, at 654 (5th ed. 2005). As another district court has held:

> It is not the duty of federal courts to try to second guess the meanings of statements and intentions of petitioners. Rather the duty is upon the individual who asserts a denial of his constitutional rights to come forth with a statement of sufficient clarity and sufficient supporting facts to enable a court to understand his argument and to render a decision on the matter.

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

**E.      Ineffective Assistance of Counsel Claims**[13]

The "benchmark" standard for determining ineffective assistance is well-established. The question is whether a trial or appellate attorney provided representational assistance to a state prisoner that was so professionally incompetent as to create issues of federal constitutional proportions. In other words, the court asks "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). If an objective answer to that

---

[13] An introduction to ineffective assistance of counsel claims is included here because of the relationship between such claims – which are governed by a highly deferential standard of constitutional law – and 28 U.S.C. § 2254(d), which is itself an extremely deferential standard of habeas review.

question is "yes," then counsel was constitutionally ineffective. *Strickland* requires that the issue be approached in two steps:

> *First, the defendant must show that counsel's performance was deficient*. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second, the defendant must show that the deficient performance prejudiced the defense*. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687 (emphasis added). A petitioner must satisfy both parts of the *Strickland* standard. *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). And, "[b]ecause both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (citation omitted).

### 1. The performance prong

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313). To satisfy this prong, the petitioner must prove that counsel made errors so serious

that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The standard for gauging attorney performance is "reasonableness under prevailing professional norms." *Id.* at 688). "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial." *Stewart*, 476 F.3d at 1209 (citing *Chandler*, 218 F.3d at 1313). Furthermore, courts must "recognize that 'omissions are inevitable, but, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). And, because the Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, "[t]he test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error and in light of all the circumstances.[14]

---

[14]*See, e.g., Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all

"Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005). To the contrary, "[a]bsolute rules would interfere with counsel's independence – which is also constitutionally protected – and would restrict the wide latitude counsel have in making tactical decisions." *Id.* (citations omitted). Judicial scrutiny of counsel's performance must be "highly deferential," because representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. *See Strickland*, 466 U.S. at 697. Indeed, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.[15] "Based

---

of the circumstances from the perspective of counsel at the time of the alleged errors").

[15]As the Court noted,

It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; *that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.* There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (emphasis added) (citations and internal quotation marks omitted)

on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis added). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that *no reasonable lawyer, in the circumstances, would have done so.*" *Rogers*, 13 F.3d at 386 (emphasis added).

## 2. The prejudice prong

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). The petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'" *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (quoting *Strickland*, 466 U.S. at 693) (alteration in original). "It is not enough for the [habeas petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, to prove prejudice, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Williams*, 529 U.S. at 391 (same). When that standard is applied in the context of the death sentence itself, " 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695). To satisfy high standard, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687). In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson*, 256 F.3d at 1177 (citations omitted).

### 3. Deference accorded state court findings of historical fact and decisions on the merits when evaluating ineffective assistance of counsel claims

State court findings of historical fact made in the course of evaluating a claim of ineffective assistance of counsel are subject to a presumption of correctness under 28 U.S.C. § 2254(d)(2) and (e)(1). *See, e.g., Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001). To overcome a state-court finding of fact, the petitioner bears the burden of proving contrary facts by "clear and convincing evidence." 28 U.S.C. §

2254(e)(1). And, a federal habeas court may grant relief on a claim of ineffective assistance of counsel only if the state-court determination involved an "unreasonable application" of the *Strickland* standard to the facts of the case. *Strickland* itself, of course, also requires an assessment of whether counsel's conduct was professionally unreasonable. Those two assessments cannot be conflated into one. *See Harrington*, 562 U.S. at 101-02. Thus, habeas relief on a claim of ineffective assistance of counsel can be granted with respect to a claim actually decided by the state courts only if the habeas court determines that it was "objectively unreasonable" for the state courts to find that counsel's conduct was not "professionally unreasonable." As the *Harrington* Court explained:

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. [356], [371-372], 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation

amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *Id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at [125], 129 S. Ct. at 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at [123], 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105 (alterations added); *see also Premo v. Moore*, 562 U.S. 115, 121-23 (2011).

## V.  SMITH'S CLAIMS

## Claim A.  Whether The Trial Court Violated Smith's Sixth, Eighth, and Fourteenth Amendment Rights by Overriding the Jury's Life Verdict and Sentencing Him to Death

On May 2, 1996, following the penalty phase of Smith's trial, the jury recommended by a vote of 11 to 1 that the court sentence Smith to life imprisonment without the possibility of parole. Vol. 1, Tab 3 at 114. The trial court subsequently overrode the jury's recommendation and sentenced Smith to death. *Id.* at 31-37; Vol.

19, Tab 34 at 1413. Smith alleges that the trial court violated his Eighth and Fourteenth Amendment rights by failing to base its sentencing determination on the individualized circumstances of Smith's character and crime, and violated his Sixth and Fourteenth Amendment rights by making factual findings constitutionally entrusted to the jury. Doc. 1 at 11.

### 1.    The Trial Court's Override of the Jury's Life Verdict

"The major requirement of the penalty phase of a [capital] trial is that the sentence be individualized by focusing on the particularized characteristics of the individual." *Armstrong v. Dugger*, 833 F.2d 1430, 1433 (11th Cir. 1987) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *Gregg v. Georgia*, 428 U.S. 153, 199 (1976)) (alteration added). Indeed, the "Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (footnotes omitted).[16] Relevant here, Smith claims that the trial court's sentencing

---

[16]*See also Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."); *Gregg v. Georgia*, 428 U.S. 153, 197, 199 (1976) (holding that " in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders," the sentencer is required

determination was unconstitutional because it failed to give him the individualized consideration required by the Eighth and Fourteenth Amendments. Doc. 1 at 12. He argues that although the trial court found one aggravating circumstance in contrast to six mitigating circumstances, the trial court "focused exclusively on the nature of the crime to the exclusion of the mitigating evidence that [he] presented during the penalty phase" in concluding that the aggravating circumstance of murder for hire outweighed the mitigating circumstances. Doc. 1 at 13. To Smith, this establishes that the trial court "abandoned the principle that '[t]he primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant,' and failed to give [him] the individualized consideration to which he was constitutionally entitled." *Id*. (quoting *Cunningham v. Zant*, 928 F.2d 1006, 1019 (11th Cir. 1991)). The record belies Smith's contention.

### (a)  The Jury's Recommendation as a Mitigating Factor

In the amended sentencing order, the trial court stated:

The Court does find that the jury's recommendation is a mitigating factor and the Court has consider[ed] said mitigating factor at this

---

to consider the circumstances of the crime and the characteristics of the individual defendant); *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender.").

sentence hearing. However, the jury was allowed to hear an emotional appeal from the defendant's mother. The Court does not find that the defendant's problems during his childhood is a mitigating factor.

Vol. 6, Tab 4 at 1095-96 (alteration added). Smith argues that this indicates the trial court did not give appropriate weight to the jury's recommendation for a life sentence, discounting it instead because the jury heard a purported improper "emotional appeal," which the trial court never explained, and testimony to which the state never objected to during the penalty phase.[17] But Smith never presented this contention to the state courts. Instead, he argued on direct appeal only that the trial judge's "reference to the jury's sentence as a 'mitigating factor' . . . improperly

---

[17]As Smith puts it,

The trial court did not provide a single example or one citation to the record to illustrate this purportedly improper influence. Nor could the trial court. As summarized above, Linda Smith testified about Mr. Smith's family background and character. *See* Vol. 17, Tab R-27 at 1096-1142. While her testimony was compelling mitigation, it was neither prejudicial nor inflammatory. . . . The State never moved to strike Linda Smith's testimony in whole or in part on the ground that it was inflammatory or prejudicial or for any other reason.

All of Linda Smith's testimony was admissible and properly considered by the jury. It also should have been considered by the trial court. In fact, the jury and the trial court were constitutionally required to consider that testimony. By refusing to consider Linda Smith's admissible testimony and further citing it as a basis to disregard the jury's recommendation for a life without parole sentence, the trial court deprived Mr. Smith of his Eighth and Fourteenth Amendment right that the sentencer "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis by Court); . . . ).

Doc. 31 at 43-45 (footnotes omitted).

minimized the weight of the jury's recommendation," doc. 29-1 at 13, and that he was adversely affected when the trial judge disregarded the advisory function of the jury because "a thorough consideration of the recommendation would have clarified [his] other mitigating circumstances," *id*. at 15.[18] Therefore, because Smith made no argument concerning his mother's testimony on appeal, it is procedurally barred from review by this court.[19]

------

[18]In denying that claim, the Court of Criminal Appeals found that:

Smith argues that the trial court minimized the jury's role in sentencing by his reference to the jury's recommendation as a "mitigating factor."

It is clear from a review of the sentencing order that the trial court considered the jury's recommendation. The trial court stated: "The Court does find that the jury's recommendation is a mitigating factor and the Court has considered said factor at this sentencing hearing."

Moreover, we do not agree with Smith that the trial court erred in finding the jury's recommendation to be a nonstatutory mitigating factor. The Supreme Court recently approved a trial court's finding that the jury's recommendation was a mitigating circumstance. *See Ex parte Burgess*, 811 So. 2d 617 (Ala. 2000). *See also, Carroll v. State*, 852 So. 2d 801 (Ala. Crim. App. 1999). . . .

*Smith*, 908 So. 2d at 299.

[19] Smith also challenges – for the first time in his reply brief – the trial court's statement that "there was evidence presented to the jury that the husband of the victim was the instigator of the killing of his wife, but the fact that the victim's husband conspired with the defendant and his co-defendants to kill his wife does not make this defendant any less culpable and is not a mitigating factor." Doc. 31 at 45 (quoting Vol. 6, Tab 4 at 1096). This argument is not properly before the court. "As we repeatedly have admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'" *Herring v. Secretary, Dep't of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005). *See also* Rules Governing Habeas Corpus Cases Under Section 2254, Rule 2© (2008) ("The petition must . . . specify all the grounds for relief available to the petitioner[.]").

To the extent Smith is raising the actual claim he raised on direct appeal – that the trial court minimized the jury's role in sentencing by referring to the jury's recommendation as a mitigating factor – he has not established that the Alabama Court of Criminal Appeals' conclusion that the trial court properly considered and weighed the aggravating and mitigating circumstances is contrary to or an unreasonable application of Supreme Court precedent or that it is based on an unreasonable determination of the facts.

### (b) Smith's Age as a Mitigating Factor

Smith also argues that the trial court discounted its finding that his age was a mitigating factor, and challenges the Court of Criminal Appeals' finding on this issue. Relevant here, the state appellate court addressed this claim on direct appeal, finding that the trial court ruled appropriately.[20] But, Smith maintains that the court

---

[20]The relevant entry from the court states,

First, Smith argues that the trial court erred in not adequately considering his age as a mitigating factor. However, this argument is not supported by the trial court's order. . . . .

Smith contends that the order states that the trial court took into account, in not considering age to be a mitigating factor, the fact that the Smith was not mentally retarded. However, it is clear that the judge considered Smith's mental maturity. A consideration of the mental maturity of an individual necessarily would take into account whether the individual is mentally retarded. This was an appropriate consideration for the trial court in determining whether Smith's age was a statutory mitigating circumstance. Certainly, the fact that Smith had held several jobs, had a steady relationship and had a child as a result of that relationship was more than sufficient for the trial court to find that Smith's age, though mitigating, was entitled to little weight.

erred because there was purportedly "no basis for the trial court to diminish the mitigating force of Mr. Smith's youth . . ." Doc. 31 at 46. To Smith, the Court of Criminal Appeals' finding that the trial court properly considered his age in the context of other facts was contrary to and an unreasonable application of *Lockett*, *Woodson*, and *Gregg*. But, as the state appellate court ruled, although the trial court found Smith's age to be a mitigating circumstance, the trial court gave it little weight in light of other factors that pointed to Smith's mental maturity. And, in considering Smith's age and other factors relevant to his mental maturity, the trial court fulfilled its constitutional obligation, consistent with *Lockett*, *Woodson*, and *Gregg*, to individualize Smith's sentence by focusing on Smith's particularized characteristics. As such, the court's conclusion was not contrary to, or an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.

© **The Trial Court's Weighing of Mitigating and Aggravating Circumstances**

Next, Smith challenges the following finding by the trial court in its sentencing order:

> The Court does find that there is a reasonable basis for enhancing the jury's recommend[ed] sentence for the reasons stated herein that this was a murder for hire and the defendant had the opportunity to reflect and withdrawn [sic] from his actions and chose not to do this; he was

---

*Smith*, 908 So. 2d at 299-300.

paid for his actions; that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired.

Doc. 1 at 15 (quoting Vol. 6, Tab 4 at 1096) (alterations added). Smith claims that this order shows that in justifying its determination that the aggravating circumstance outweighed the mitigating circumstances, the trial court only focused on the aggravating circumstances.

Smith raised this issue unsuccessfully on direct appeal when he argued that the trial court's amended sentencing order reflects that the trial court considered "improper," "non-statutory" aggravating evidence. Doc. 29-1 at 10-12. As the Court of Criminal Appeals put it in denying Smith's claim, under Alabama law, "the weight to be attached to the aggravating and the mitigating evidence is strictly within the discretion of the sentencing authority." *Smith*, 908 So. 2d at 298-99. Smith argues that the court's conclusion was contrary to and an unreasonable application of *Lockett*, *Woodson*, and *Gregg* because:

> In effect, the trial court sentenced Mr. Smith to death because he committed a murder for hire and by treating the absence of a mitigating circumstance as another aggravating circumstance . . . Under the trial court's reasoning, every defendant convicted of murder for pecuniary gain would be sentenced to death regardless of any evidence concerning that defendant's individual background, character, and circumstances, contrary to clearly established federal law that a capital sentencing scheme can neither impose a mandatory death sentence for particular crimes nor limit the sentencer's consideration of mitigating factors.

Doc. 31 at 48. But, as the Court of Criminal Appeals concluded, however, the trial court properly exercised its sentencing authority in placing more weight than the jurors on the murder for hire aspect of the case. And, in doing so, the trial court gave Smith the individualized sentencing consideration required by the Constitution. As such, the state appellate court's conclusion was not contrary to, or an unreasonable application of Supreme Court precedent, and was not based on an unreasonable determination of the facts.

### (d)    Evidence Post-Dating Smith's Sentence

Finally, Smith claims that post-sentencing evidence confirms that the trial court failed to give the constitutionally required consideration to his individualized circumstances. Doc. 1 at 21-22. Smith cites first to a "nearly identical" sentencing order in another capital case that the trial judge issued, noting that the trial court's "effective" use of a "form order" is the antithesis to the individualized determination required by the Constitution. Doc. 31 at 50. Second, Smith cites to comments the trial judge made to the *Gadsden Times* several years after his trial in which the trial judge discussed his decision to override the juries' advisory verdicts in Smith's and in the other case: "'I thought they deserved the death penalty the way the crimes were,' [Judge] Tompkins said. 'Some people serving on juries especially on these cases have never been in court before and they don't want the responsibility to sentence someone

to death.'" Doc. 1 at 22 (quoting Vol. 40 at 908). Smith maintains that these comments illustrate that that the trial judge based his sentence solely on "'the way the crimes were' to the exclusion of the individualized consideration that the Constitution mandates." *Id.* at 22.

Smith unsuccessfully raised this claim in his Rule 32 petition. In affirming the trial court's denial of the claim, the Court of Criminal Appeals noted that the circuit court heard evidence on this issue, rejected Smith's contention that the quoted language established that Judge Tompkins, the sentencing judge, acted improperly, and that "[n]one of the evidence [Smith] presented . . . establishes that the trial court's sentencing decision was based on political pressure, improper considerations of aggravating and mitigating circumstances, or that it was otherwise in violation of Smith's constitutional rights." Vol. 45, Tab 102 at 19 - 22.[21]

Contrary to Smith's contention, the Court of Criminal Appeals' finding is not an unreasonable determination of the facts and did not result in a decision that is contrary to or an unreasonable application of clearly established Supreme Court precedent. Doc. 1 at 23. Neither the similarity of the sentencing order in Smith's case

---

[21] Although neither court specifically mentioned the portion of this claim comparing Smith's sentencing order with the sentencing order from the other case, Smith raised the claim in his amended Rule 32 petition and on appeal from the denial of that petition. Vol. 38, Tab 78 at 439-40; Vol. 42, Tab 86 at 29-30. Thus, this court assumes for purposes of this memorandum opinion that the state courts considered it as part of the entire claim.

with the order in the other capital case, nor the trial judge's comment in the *Gadsden*
*Times* lends merit to the contention that the trial judge failed to consider Smith's
particularized characteristics in sentencing him to death. And, there is no evidence
to indicate that the trial judge failed to give Smith the individualized consideration
required by the Constitution. Therefore, the Court of Criminal Appeals' finding that
the evidence does not support a claim that the trial court's sentencing decision was
"based on political pressure, improper considerations of aggravating and mitigating
circumstances, or that it was otherwise in violation of Smith's constitutional rights"
was not unreasonable.

### 2. Alabama's Capital Sentencing Scheme

Smith challenges next Alabama's judicial override system, contending that
Alabama's capital sentencing scheme denied him the individualized consideration of
his character and the particular circumstances of his crime because it allowed the trial
judge to reject the jury's recommended sentence. Doc. 1 at 17-22. As Smith puts it,
Alabama's elected judges face political pressure to override jury recommendations
for a life sentence and to impose death sentences instead. *Id*. Smith raised this claim
for the first time in his amended Rule 32 petition, and the Court of Criminal Appeals
found it procedurally barred "because it could have been raised at trial or on appeal,

but it was not." Vol. 45, Tab 102 at 20. Consequently, the state argues that Smith is barred from raising the claim in this court.

In response, Smith makes no arguments related to cause or prejudice, and argues only about a purported miscarriage of justice.[22] But, to overcome the procedural default of this claim with the miscarriage of justice exception, Smith must show "by clear and convincing evidence that but for constitutional error, no reasonable juror would find him *eligible* for the death penalty under [state] law." *Sawyer v. Whitley*, 505 U.S. 333, 348 (emphasis added); *see also Dretke v. Haley*, 541

---

[22]Smith states:

As Respondents concede, claims are not procedurally barred when a fundamental miscarriage of justice would result. *See* Resp. Br. at 18; *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). That would result where the federal court declines to hear a claim that would establish the petitioner's "actual innocence" of the death penalty, requiring him to "show, by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at 336; *see also Johnson v. Singletary*, 991 F.2d 663, 668 (11th Cir. 1993) (petitioner must show "but for the alleged constitutional error, the sentencing body *could not* have found *any* aggravating factors and thus the petitioner was ineligible for the death penalty" (emphasis by Court)).

Mr. Smith's claim is not based on the exclusion of mitigating evidence, which would not satisfy that standard. *See Sawyer*, 505 U.S. at 347. It is based on the fact that the trial court – the sentencing body – could not have found Mr. Smith eligible for the death penalty because, in the circumstances here, the Eighth and Fourteenth Amendments barred the court from overriding the jury's advisory life verdict. Accordingly, the Court should consider Mr. Smith's claim.

Doc. 31 at 57.

U.S. 386, 388 (2004). Here, however, Smith argues that the trial court could not have found him eligible for a death sentence because the court committed constitutional errors in overriding the jury's recommended sentence of life without parole. Unfortunately for Smith, in Alabama, the trial judge's role in weighing aggravating and mitigating circumstances to make the final sentencing decision does not affect Smith's eligibility for the death penalty. Instead, a defendant in Alabama is eligible for the death penalty if "at least one aggravating circumstance as defined in Section 13A-5-49 exists." Ala. Code § 13A 5-45(f). In this case, Smith's eligibility for the death penalty stemmed from his underlying conviction of murder for pecuniary gain, which is an aggravating circumstance under Alabama law. *See* Ala. Code § 13A-5-49(6). Accordingly, Smith cannot use the miscarriage of justice exception to overcome the procedural default of this claim.

### 3. Violation of *Ring v. Arizona*

As his final contention of alleged error by the trial court, Smith argues that the court violated *Ring v. Arizona*, 536 U.S. 584 (2002), when it rejected the jury's recommendation for life without parole. Doc. 1 at 23-29. Smith argues that, consistent with *Ring's* holding, a jury, rather than a judge, must determine "any fact on which the legislature conditions an increase in [a capital defendant's] maximum punishment," and, therefore, his jury should have been required to find beyond a

reasonable doubt both that an aggravating circumstance existed and that the aggravating circumstance outweighed the mitigating factors. Doc. 31 at 26-28 (quoting *Ring*, 536 U.S. at 466).

The state argues incorrectly that the *Ring* claim is procedurally barred. Just six weeks after the Supreme Court decided *Ring*, Smith raised this issue on August 6, 2002, in a Motion for Leave to File Supplemental Authority while his direct appeal was pending on a petition for certiorari. Doc. 29-2. The Alabama Supreme Court initially granted the petition, but quashed the writ two years later as having been improvidently granted. *Ex parte Smith*, 908 So. 2d 302 (Ala. 2005). Thereafter, Smith raised his *Ring* claim in his Rule 32 petition, Vol. 32, Tab 57 at 490-94, and the trial court dismissed the claim as precluded by Rule 32.2(a)(4) of the Alabama Rules of Criminal Procedure and also denied the claim on the merits, Vol. 36, Tab at 139-42. On appeal from the denial of his Rule 32 petition, the Court of Criminal Appeals affirmed, finding the claims procedurally barred under "Rule 32.2(a)(4), Ala. R. Crim. P., because they were raised or addressed on appeal." Vol. 45, Tab 102 at 18. This finding is the basis for the state's contention that the *Ring* claim is procedurally barred.

The state ignores, however, that the Court of Criminal Appeals overlooked that, although Smith raised the claim on direct appeal within days of the *Ring* decision, the

Alabama Supreme Court declined to address Smith's claims when it denied his petition for certiorari. A denial of a writ of certiorari is not a decision on the merits. *See Ex parte McDaniel*, 418 So. 2d 934, 935 (Ala. 1982). Therefore, because Smith raised this issue immediately after the Supreme Court decided *Ring* and never had the merits of the claim considered, the state courts' holding that the claim was procedurally barred was improper.

Turning now to the merits of Smith's claim, in *Ring*, the Supreme Court extended to death penalty cases its ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *See Ring*, 536 U.S. at 584. In doing so, *Ring* held that aggravating circumstances used to justify an increase in the maximum punishment from life imprisonment to death become "the functional equivalent of an element of a greater offense," and must be found by a jury. *Id.* at 609.[23] Thereafter, in *Hurst v. Florida*, 136 S. Ct. 616 (2016), the Court applied *Ring*

---

[23] The holding in *Ring* does not apply retroactively to cases that were already final on direct appeal when the Court announced *Ring*. *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004). *Ring* applies to Smith's case because his direct appeal was still pending before the Alabama Supreme Court when *Ring* was decided.

to find Florida's capital sentencing scheme unconstitutional,[24] holding that in light of *Ring*, Florida's former death penalty scheme violated the defendant's Sixth Amendment right to an impartial jury because it "required the judge alone to find the existence of an aggravating circumstance" to impose the death penalty. *Hurst*, 136 S. Ct. at 624. Under Florida law, life imprisonment was the maximum sentence a defendant convicted of first degree murder could receive on the basis of his conviction alone. *Id*. at 620. A death sentence could be imposed only if an additional sentencing proceeding resulted in "findings by the court that such person shall be punished by death." *Id*.

The additional sentencing proceeding in Florida was a hybrid proceeding "in which [a] jury render[ed] an advisory verdict but the judge ma[de] the ultimate sentencing determinations." *Id*. (quoting *Ring*, 536 U.S. at 608, n.6) (alterations added). First, state law required the sentencing judge to hold an evidentiary hearing before the jury, then the jury rendered an "advisory sentence" without specifying the factual basis for its recommendation. *Id*. Finally, the sentencing judge, notwithstanding the jury's recommendation, independently weighed the aggravating

---

[24] Because Smith's conviction became final on direct appeal before the *Hurst* decision, the court discusses *Hurst* "only to the extent it reflects an application and explication of the Supreme Court's holding in *Ring*." *Waldrop v. Comm'r, Alabama Dep't of Corr*., 711 F. App'x 900, 923 n.6 (11th Cir. 2017).

and mitigating circumstances and rendered the sentence of death. *Id*. And, although the judge was required to give the jury's recommendation "great weight," the sentence was required to reflect the judge's "independent judgment about the existence of aggravating and mitigating factors." *Id*. The Court found that this capital sentencing scheme violated *Ring* because it "required the judge alone," and not the jury, "to find the existence of an aggravating circumstance." *Id*. at 624.

Alabama, like Florida, also bifurcates the guilt and penalty phases of capital trials. *See* Ala. Code § 13A-5-45. After a defendant is convicted of a capital offense, the trial court conducts a separate sentencing hearing to determine the defendant's sentence. *See* Ala. Code § 13A-5-45(a). A defendant may not be sentenced to death unless "at least one aggravating circumstance as defined in 13A-5-49 exists." Ala. Code § 13A-5-45(f). Certain capital offenses, like the murder for pecuniary gain for which Smith was convicted, have a built-in aggravating circumstance that corresponds to one of the aggravating circumstances listed in § 13A-5-49. *Compare* Ala. Code § 13A-5-40(a)(7) (listing as a capital offense "murder done for pecuniary or other valuable consideration or pursuant to a contract or for hire") *with* Ala. Code § 13A-5-49(6) (listing as an aggravating circumstance that the "capital offense was committed for pecuniary gain"). Alabama law provides that when a defendant is convicted of such a capital offense, "any aggravating circumstance which the verdict

convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing." Ala. Code § 13A-5-45(e).

The sentencing hearing usually occurs before the same jury that convicted the defendant. At the time of Smith's conviction and sentencing, Alabama law required the jury to "hear the evidence and arguments of both parties, deliberate, and return an advisory verdict recommending either life imprisonment without parole (if it determined that no aggravating circumstances existed, or that the aggravating circumstances did not outweigh the mitigating circumstances) or death (if it determined that one or more aggravating circumstances existed, and that they outweighed the mitigating circumstances)." *Waldrop v. Comm'r, Alabama Dep't of Corr.*, 711 F. App'x 900, 922 (11th Cir. 2017) (citing the pre-2017 version of Ala. Code § 13A-5-46(e)). After receiving the jury's advisory verdict, the court would then "independently determine the appropriate sentence." *Id*. (citing the pre-2017 version of Ala. Code § 13A-5-47(a)). "If the court found that at least one aggravating circumstance existed, and that they outweighed any mitigating circumstances, it could

impose a death sentence, notwithstanding a contrary jury recommendation." *Id.*; *see also* Ala. Code § 13A-5-47(e) (pre-2017 version).[25]

Turning again to the specific contentions here, the court notes that, although it found Smith's *Ring* claim procedurally barred, the Court of Criminal Appeals addressed the merits of the *Ring* claim in an alternative holding, finding that the jury's convicted smith of a crime with an aggravating circumstance:

> As the circuit court correctly noted, the jury in Smith's case unanimously determined by its guilty verdict on the charge of murder for pecuniary or other valuable consideration, § 13A-5-40(a)(7), Ala. Code 1975, the overlapping aggravating circumstance that the murder was committed for pecuniary gain, § 13A-5-49(6), Ala. Code 1975. "Therefore, the findings in the jury's verdict alone exposed [Smith] to a range of punishment that had as its maximum the death penalty. This is all *Ring* and *Apprendi* [*v. New Jersey*, 530 U.S. 466, (2000),] require." *Waldrop*, 859 So. 2d at 1188.

Vol. 45, Tab 102 at 18-19 (alterations in original). The court's decision was not contrary to or an unreasonable application of *Ring*, and was not an unreasonable determination of the facts. Smith became death-eligible when the jury convicted him of murder for pecuniary gain, which is also an aggravating circumstance under Ala. Code § 13A-5-49(6). As explained above, Alabama law requires the existence of only

---

[25] In 2017, Alabama amended its capital sentencing laws. *See* S.B. 16, 2017 Leg., Reg. Sess. (Ala. 2017). Under the new sentencing scheme, the jury's sentence recommendation is binding on the court. *See* Ala. Code § 13-A-5-47(a) (2017) ("Where a sentence of death is not returned by the jury, the court shall sentence the defendant to life imprisonment without parole.").

one aggravating circumstance for a defendant to be death-eligible, which the jury found when it found Smith committed murder for pecuniary gain by returning a guilty verdict. *See* 13A-5-45(e). Thus, every fact that made Smith death-eligible was found by the jury, beyond a reasonable doubt, at the guilt phase of his trial. That is what *Ring* requires.

Smith argues also that *Ring* requires the jury – not the judge – to weigh the aggravating and mitigating factors. Doc. 31 at 34-37. This contention is unavailing. To begin, the Eleventh Circuit foreclosed this argument when it held that "[n]othing in *Ring* – or any other Supreme Court decision – forbids the use of an aggravating circumstance implicit in a jury's verdict" and that "*Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances." *Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172, 1198 (11th Cir. 2013). Also, the Court of Criminal Appeals rejected Smith's argument, noting that the jury's verdict alone made Smith death-eligible. Vol. 45, Tab 102 at 19. This conclusion is not "so unreasonable that no 'fairminded jurist' could agree with the conclusion." *Waldrop*, 711 F. App'x at 923 (citing *Harrington v. Richter*, 562 U.S. 86, 101 (2011). In fact, it is consistent with Justice Scalia's explanation of the holding in *Ring*:

What today's decision says is that the jury must find the existence of the fact that an aggravating factor existed. Those states that leave the ultimate life-or-death decision to the judge may continue to do so – by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase.

*Ring*, 536 U.S. at 612-13 (Scalia, J., concurring). And, as the Eleventh Circuit has explained, the Alabama Court of Criminal Appeals' application of *Ring* is also consistent with *Hurst*, which held that "the Sixth Amendment does not allow the trial court 'to find an aggravating circumstance, *independent of a jury's factfinding*, that is necessary for imposition of the death penalty.'" *Waldrop*, 711 Fed. App'x at 924 (quoting *Hurst*, 136 S. Ct. at 624) (emphasis in original).

To close, the Court of Criminal Appeals' rejection of Smith's *Ring* claim was not contrary to or an unreasonable application of *Ring* and was not based on an unreasonable determination of the facts. Thus, Smith is not entitled to relief.

**Claim B.    Whether Trial Counsel Violated Smith's Sixth and Fourteenth Amendment Rights by Rendering Constitutionally Ineffective Assistance**

Smith contends that his trial counsel's performance fell below "an objective standard of reasonableness" and that counsel failed to make the trial "a reliable adversarial testing process." Doc. 1 at 30 (quoting *Strickland*, 466 U.S. at 688). He adds that none of their errors can be construed as part of a "sound trial strategy," and

that their performance "undermine[d] confidence in the outcome" of his trial. *Id.* (quoting *Strickland*, 466 U.S. at 689, 694). Consequently, Smith alleges that a reasonable probability exists that a jury would not have convicted him of capital murder or that the trial court would not have sentenced him to death if counsel had rendered constitutionally adequate assistance. Doc. 1 at 30.

### 1.    Ineffective Assistance of Counsel in the Guilt Phase

Smith argues that counsel's performance fell below an objective standard of reasonableness during the guilt phase of his trial for a variety of reasons, each discussed below.

### a.    The Suppression Hearing

As his first contention of alleged ineffective assistance, Smith challenges counsel's performance related to the suppression of evidence.  Counsel filed a "Motion to Suppress Tangible Evidence and Statements as the Fruits of an Unlawful Search and Illegal Arrest," Vol. 2 at 362-76, and the trial court held a hearing on the motion on June 27, 1994 and again on April 12, 1996, Vol. 9, Tab 6; Vol. 10, Tab 7 - Vol. 11 at 385. The trial court denied the motion, and admitted at trial Smith's statement, over counsel's objections. Vol. 45, Tab 102 at 30. Smith claims that counsel rendered ineffective assistance by unreasonably failing to establish that the

state recovered the victim's VCR through an unlawful search and obtained Smith's custodial statement in violation of his constitutional rights. Doc. 1 at 31.

Generally, a petitioner may not seek habeas relief for Fourth Amendment violations. *Stone v. Powell*, 428 U.S. 465, 494 (1976). However, a petitioner may bring a Sixth Amendment ineffective assistance of counsel claim arising from a Fourth Amendment issue if the purported failure to adequately litigate the alleged Fourth Amendment violation is the basis for the ineffectiveness claim. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). To do so, petitioner must satisfy the first prong of *Strickland* – that counsel were deficient – and demonstrate actual prejudice, i.e. "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Id*.

### (1) The Search of Smith's Home

A Lauderdale County circuit judge issued a search warrant for Smith's home, based on an affidavit executed by Captain Ronnie May of the Colbert County Sheriff's department.[26] Vol. 8 at 1599 - Vol. 9 at 1605. The authorities searched Smith's home that same day, Vol. 8 at 1599, and found the VCR that the assailants had stolen from the victim's home, Vol. 10, Tab 7 at 191-92 and Vol. 11 at 227-35.

---

[26] The murder occurred in Colbert County, but Smith's home was in Lauderdale County.

After finding the VCR, Captain Ronnie May read Smith his *Miranda* rights and Smith agreed to accompany Captain May to the sheriff's station, Vol. 11 at 235-43, where Smith ultimately confessed to his participation in the murder and to stealing the VCR, Vol. 23 at 297-304.

Smith alleges that the search warrant was invalid on its face and execution, and based on information from an anonymous informant acting as an agent of the state. Doc. 1 at 32-34. Smith raised these claims in his Amended Rule 32 petition, Vol. 32, Tab 57 at 441-446, which the trial court summarily denied, Vol. 30, Tab 52 at 18-20, and the Court of Criminal Appeals affirmed. Vol. 45, Tab 102 at 33-34. In affirming the trial court, the court found that Smith was not entitled to relief because "the claims regarding the search were raised by trial counsel and rejected, and were also rejected on appeal." Vol. 45, Tab 102 at 33. However, Smith did not argue at trial or on direct appeal that the search warrant was invalid on its face or execution. He raised this specific challenge for the first time in his Rule 32 proceedings as part of his ineffective assistance of counsel claim. Because the Court of Criminal Appeals based its decision on the mistaken belief that the state courts had already addressed the merits of the Fourth Amendment claim underlying this ineffective assistance of counsel claim, this court will review these two claims *de novo*.

### (a)    Warrant Invalid on its Face

As his first contention of error related to the search warrant, Smith argues:

> The search warrant that led to the recovery of the VCR was invalid on its face. Alabama law requires that a search warrant be "directed to the sheriff or constable of the county." Ala. Code § 15-5-5. This statute has been strictly construed under state law. But the search warrant issued in Lauderdale County was directed to "ANY SHERIFF OF THE STATE OF ALABAMA."

Doc. 1 at 32. Thus, Smith contends that the search of his home violated the Fourth and Fourteenth Amendments, and his attorneys proved ineffective for failing to challenge the warrant on that basis. *Id.* To succeed on this claim, Smith must prove that counsel's failure to challenge the search warrant on this issue was objectively deficient, that his "Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman*, 477 U.S. at 375. Smith cannot meet this threshold.

The Fourth Amendment, which is applicable to the states through the Fourteenth Amendment, guarantees the right to be free from unreasonable searches and seizures, mandating that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. But, "'whether or not

a search is reasonable within the meaning of the Fourth Amendment,' . . . has never 'depend[ed] on the law of the particular State in which the search occurs." *Virginia v. Moore*, 553 U.S. 164, 172 (2008) (alterations in original) (quoting *California v. Greenwood*, 486 U.S. 35, 43 (1988)). Although states may impose more stringent requirements than the Constitution, "state restrictions do not alter the Fourth Amendment's protections." *Id*. at 176. "[I]t is not the province of the Fourth Amendment to enforce state law." *Id*. at 178. Thus, even assuming that the discrepancy between the language in Ala. Code § 15-5-5 and the language on the search warrant violates Alabama law, the Fourth Amendment is not implicated.

Furthermore, Smith has not established a violation of Ala. Code § 15-5-5, which requires that a search warrant be "directed to the sheriff or to any constable of the county." The defect in the *Jones v. State*, 306 So. 2d 45, 46-47 (Ala. 1975), case Smith cites, doc. 31 at 59, stemmed from the fact that the warrant was "not directed to any officer whatever." *Jones*, 306 So. 2d at 47. That was not the case here. Indeed, Alabama courts have routinely upheld the validity of search warrants directed to law enforcement officers, even when those warrants do not track the statutory language

word for word.[27]   For these reasons, Smith is unable to demonstrate prejudice by counsel's failure to raise this issue during his trial. *See Kimmelman*, 477 U.S. at 375.[28]

### (b)    Warrant Invalid in its Execution

Smith argues also that the search warrant was invalid in its execution because Captain May, a Colbert County law enforcement officer, executed it in Lauderdale County, in purported violation of Ala. Code § 15-5-7. Doc. 1 at 32.[29] To succeed on this claim, Smith must prove that counsel's failure to raise this issue  was objectively deficient, that the claim is meritorious, and that there is a reasonable probability that

---

[27]*See, e.g.*, *Little v. Gaston*, 232 So. 3d 231, 235 (Ala. Civ. App. 2017) (upholding warrant addressed to "any sheriff, deputy, and/or municipal officer or duly sworn law enforcement officer of the state"); *Palmer v. State*, 426 So. 2d 950, 953 (Ala. Crim. App. 1983) (upholding warrant issued to "any Sheriff, Deputy and/or Municipal Police"); *Hicks v. State*, 437 So. 2d 1344, 1345 (Ala. Crim. App. 1982) (upholding warrant directed to "the Chief of Police or any police officer of the City of Birmingham, Alabama" rather than "any sheriff, deputy sheriff, or constable"); and *Meade v. State*, 390 So. 2d 685, 688, 692 (Ala. Crim. App. 1980) (upholding warrant directed "[t]o Any Sheriff, Constable or Lawful Officer of the State of Alabama").

[28] Because Smith must satisfy both parts of the *Strickland* test to show a violation of the Sixth Amendment, the court need not address the performance prong. *See Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000).

[29]More specifically, Smith maintains that:

Alabama law requires that a "search warrant may be executed by any one of the officers to whom it is directed, but by no other person except in aid of such officer at his request, he being present and acting in its execution." Ala. Code § 15-5-7. These Alabama statutory provisions "dictate that the 'sheriff' or a 'constable of the particular county' in which the warrant is issued will execute the search warrant." *Rivers v. State*, 406 So.2d 1021, 1022 (Ala. Crim. App. 1981 ). As a Colbert County official executed the search warrant in Lauderdale County, the search warrant was invalid under § 15-5-7.

Doc. 1 at 32.

the verdict would have been different absent the excludable evidence. *See Kimmelman*, 477 U.S. at 375. Smith cannot meet this threshold.

As previously discussed, this claim relies solely on a violation of state law as it is premised on the contention that the execution of the search warrant in Lauderdale County by a Colbert County law enforcement officer violates Alabama Code § 15-5-7. The Fourth Amendment is not implicated by that state law violation. *See Moore*, 553 U.S. at 172. Moreover, Smith has not established a violation of § 15-5-7, which provides that "[a] search warrant may be executed by any one of the officers to whom it is directed, but by no other person except in aid of such officer at his request, he being present and acting in its execution." To Smith, this statute dictates "that the 'sheriff' or a 'constable of the particular county' in which the warrant is issued will execute the warrant." Doc. 31 at 60 (quoting *Rivers v. State*, 406 So. 2d 1021, 1022 (Ala. Crim. App. 1981). But, the search warrant was directed to "Any Sheriff of the State of Alabama," and it was based on the affidavit of Captain May, an investigator with Colbert County Sheriff's department. Vol. 8 at 1599 - Vol. 9 at 1605. And Captain May, along with Lauderdale County Sheriff's officials, executed the warrant, Vol. 10, Tab 7 at 191-92, and a Lauderdale County Sheriff's investigator, who was part of the search, returned the warrant afterwards, Vol. 8 at 1599. Therefore, even assuming that Captain May was not authorized to execute the warrant in Lauderdale

County, the participation of Lauderdale County investigators in the execution of the warrant puts the search in compliance of Ala. Code § 15-5-7. As such, Smith's ineffective assistance of counsel claim lacks merit because Smith is unable to demonstrate the requisite prejudice. *See Kimmelman*, 477 U.S. at 375.

© **Warrant Invalid Because it Was Based on Information from an Anonymous Informant**

Finally, Smith claims that the search warrant was invalid because it was "procured based on information obtained by police improperly and illegally from informant '569S,' who searched [his] home at the behest of the police, when the police themselves could not lawfully enter." Doc. 1 at 34.[30]  Counsel raised this

---

[30]Specifically, Smith claims that:

When 569S contacted the police, they gave her the Crimestoppers' telephone number, told her what kind of additional information they required to proceed with the investigation, and established a routine whereby 569S contacted them daily to report additional information. ([Vol. 10, Tab 7 at] 79-82, 156-58; [Vol. 9, Tab 6 at] 19-20.) During their conversations, 569S named the alleged perpetrators, their girlfriends, and identified their cars and homes. But she was unable to provide detailed information about a VCR that she claimed was in Mr. Smith's home. ([Vol. 10, Tab 7 at] 111-12, 145-46.) The police told 569S that they needed more information about the VCR ([Vol. 10, Tab 7 at] 149-50), and that they were aware that she intended to return to the house. ([Vol. 10, Tab 7 at] 151-52, 164.)

Thereafter, 569S returned to Mr. Smith's house and contacted the police with additional information about the VCR, including that it was manufactured by Samsung, was a front loader, and that it did not have a remote control. ([Vol. 10, Tab 7 at] 165-66.) The police obtained a warrant to search Mr. Smith's home based on the information supplied by 569S.

Doc. 1. at 34 (alterations added).

70

contention in a motion to suppress, Vol. 2 at 362-76, which the trial court denied after two hearings, Vol. 9, Tab 6; Vol. 10, Tab 7 - Vol. 11 at 385. Counsel challenged the ruling on direct appeal, Vol. 25, Tab 36 at 39-49, and the Court of Criminal Appeals affirmed the trial court, finding that "[t]he record shows that caller 569S was not encouraged to enter Smith's house – she did so of her own free will. . . . The informant was acting as a private citizen; therefore, Smith's Fourth Amendment protections were not violated." *Smith*, 908 So. 2d at 286-89.

As part of his contention of alleged error, Smith argues that he is raising a different Fourth Amendment claim, contending that "his ineffective assistance of counsel claim is based on trial counsel's failure to investigate and present evidence [that was available to them but was not used at the suppression hearing or on direct appeal] that would have permitted them to establish that the informant acted as an agent of the State." doc. 31 at 62 (alteration added). He argues that:

> At the suppression hearing, Captain May, the lead investigator from the Colbert County Sheriff's Department on Mr. Smith's case, produced the notes taken by law enforcement officers during the course of the investigation. ([Vol. 10, Tab 7 at] 50-51.) Trial counsel failed to question Captain May at the suppression hearing with those, which indicate that law enforcement officers knew of and acquiesced in the informant's search of Mr. Smith's home and that the informant's purpose was to assist law enforcement efforts, rather than to further her own ends. Among other things, those notes indicate that the investigators asked the informant when she would be able to go to Mr. Smith's house.

71

Doc. 1 at 35 (alteration added).

Smith unsuccessfully raised this claim in his Rule 32 petition and on appeal from the denial of that petition. In affirming the trial court, the Court of Criminal Appeals again found that Smith was not entitled to relief because "the claims regarding the search were raised by trial counsel and rejected, and were also rejected on appeal." Vol. 45, Tab 102 at 33. However, as Smith notes, he raised this specific Fourth Amendment challenge for the first time in his Rule 32 proceedings as part of his ineffective assistance of counsel claim. Therefore, because the state appellate court based its decision on the mistaken belief that the state courts had already addressed the merits of this claim, this court will review the claim *de novo*.

At issue here is Smith's contention that his trial counsel failed to question law enforcement officers about notes which "would have established that, contrary to the testimony at the suppression hearing, law enforcement officers encouraged the anonymous informant to enter Mr. Smith's home and to obtain specific information that was critical to their investigation." Doc. 1 at 35. The state produced the notes in question to defense counsel at the suppression hearing. Vol. 10, Tab 7 at 50-51. However, those notes were not marked as exhibits, *id.* at 51, and this court has not found them in the record, nor has Smith directed the court to the relevant portion of the record where those notes are located. This means the court is left only with

Smith's assertion that the notes "indicate that the investigators asked the informant when she would be able to go to Mr. Smith's house." Doc. 1 at 35.

Smith argues that if counsel had discovered that investigators asked the informant this question, counsel would have proved that the warrant was invalid, and successfully suppressed evidence of the VCR and Smith's statement. *Id.* To succeed on this claim, Smith must prove that counsel's failure to question law enforcement officers about the notes was objectively deficient, that his "Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman*, 477 U.S. at 375. Smith cannot show that counsel's failure to question Captain May about the contents of the investigatory notes meets the objectively deficient showing because, as Smith concedes, his counsel in fact questioned Captain May extensively on this issue. Vol 10, Tab 7 at 29-112, 145-194; Vol. 11 at 195-267; Vol. 9, Tab 6 at 4-18, 31-34, 38-40.

Captain May testified on direct examination at the suppression hearing that in his first conversation with the Crimestoppers informant, the informant asked him what type of information Captain May needed. Vol. 10, Tab 7 at 80. Captain May testified that he told her he needed the exact names of the people involved, where they lived, what kind of cars they drove, if they had taken anything from the crime

scene, and the location of any stolen items. *Id*. at 80-81. He also testified that he knew that Investigator Miller asked the informant to provide more information concerning the VCR, that the informant stated she would try to re-enter Smith's house to obtain the information, and that the informant "had not obtained any kind of authorization . . . to go back into the house." *Id*. at 149, 152-53. Captain May later repeated that he understood that the only way law enforcement would obtain information about the VCR was for the informant to return to the house, and "that she was going to" do so. *Id*. at 164. And, on redirect examination, Captain May added that although he knew that the informant planned to return to Smith's house, he had no idea how she re-entered the house. Vol. 9, Tab 6 at 19, 37.

Despite this line of questioning, Smith argues that counsel proved ineffective due to their failure to question Captain May about the contents of the investigatory notes, especially as it pertains to the entry that "the investigators asked the informant when she would be able to go [back] to Mr. Smith's house." Doc. 1 at 35. As Smith puts it, this line of questioning "would have established that, contrary to the testimony at the suppression hearing, law enforcement officers encouraged the anonymous informant to enter Mr. Smith's home and to obtain specific information that was critical to their investigation." *Id*. Even accepting Smith's contention that the notes contained such an entry, questioning Captain May about whether law enforcement

74

asked the informant when she would return to Smith's house would not have aided the defense's case for suppression. Captain May had already testified that when he first spoke to the informant, he explicitly instructed her on the type of information that he needed, that he knew Investigator Miller had asked the informant to provide more information about the VCR in Smith's home, and that he knew the informant planned to return to Smith's home to gather more information. Based on this testimony that Captain May provided, additional questioning about whether law enforcement asked the informant when she would return to Smith's house to obtain more information would not have aided the defense in its attempt to establish that the officers "knew of and acquiesced in the informant's search." Thus, it was not unreasonable for counsel not to question Captain May about that portion of the notes. Therefore, Smith's ineffective assistance of counsel claim on this issue fails.

### (2)    The Custodial Statement

Smith claims that trial counsel failed to adequately challenge his custodial statement which he contends the state obtained in violation of Article 1, Section 6 of the Alabama Constitution. Doc. 1 at 36-40. He alleges that counsel should have established facts related to the circumstances surrounding his custodial statement[31]

---

[31] Smith claims that:

After Mr. Smith was read his *Miranda* rights, Mr. Smith asked the arresting officer,

and the alleged waiver of his *Miranda* rights,[32] and that counsel should have argued that Smith's intoxication and his medical condition rendered his statement involuntary.[33] *Id*. at 37-38. Allegedly, the failure to raise these challenges prejudiced Smith because his statement was the most critical evidence against him, it provided the lens through which the state asked the jury to view all the evidence, and, without it, a reasonable probability existed of an acquittal. *Id*. at 39-40.

Smith unsuccessfully raised this claim in his amended Rule 32 petition, and the Court of Criminal Appeals affirmed the trial court, finding in part "that Smith did not satisfy the specificity and full factual pleading requirements of Rule 32.3 and Rule 32.6(b)," and that "Smith failed to allege any facts indicating whether trial counsel

---

Captain Ronnie May, whether he needed an attorney. Captain May simply read Mr. Smith his Miranda rights again. Mr. Smith again asked whether he needed an attorney. Captain May again simply repeated his *Miranda* rights to Mr. Smith. Captain May never made any attempt to clarify Mr. Smith's request. Only after Captain May repeatedly ignored Mr. Smith's questions as to whether he needed an attorney, did Captain May purport to obtain a waiver of Mr. Smith's *Miranda* rights. Captain May then proceeded to interrogate Mr. Smith.

Doc. 1 at 37.

[32] Smith claims that Captain May coerced his statement by telling Smith others had implicated him; by assuring Smith that he knew Smith did not commit the murder and that he could only help him if Smith talked to him; by suggesting that Smith could go home if he cooperated; and by promising to speak to the prosecutor on Smith's behalf if he cooperated. Doc. 1 at 37-38.

[33] Smith claims that at the time of the interrogation, he was under the influence of alcohol and Valium and that he was experiencing severe migraine headaches. (Doc. 1 at 38). He adds that despite counsel's knowledge of his "medical condition," counsel failed to consult a medical expert and submitted no evidence regarding Smith's "condition" at the suppression hearing or during the trial.

were aware of, but disregarded the circumstances that he now says counsel should have presented to the trial court to secure suppression of the statement, or whether trial counsel were unaware of the circumstances because they failed to conduct a sufficient investigation to discover them." Vol. 45, Tab 102 at 29-31. Next, the court noted that given counsel's "vigorous challenge to the admission of the statement in the trial court, and . . . it would be possible, if not probable, that counsel were aware of these additional circumstance but chose to seek suppression based on what they believed to be grounds that had a greater chance for success, and that the failure to allege these additional allegations was a matter of trial strategy." *Id.* Finally, the court found that to the extent Smith is claiming "that trial counsel failed to present these grounds because they were unaware of them, Smith failed to make that allegation, and he failed to plead any facts showing the scope of trial counsel's investigation and what additional investigation he believed counsel should have made to discover the alleged facts." *Id.*

The Court of Criminal Appeals' finding that Smith insufficiently pleaded this claim is a ruling on the merits. *See Borden v. Allen*, 646 F.3d 785, 812-13 (11th Cir. 2011). Therefore, this court "must review the merits determination of the Court of Criminal Appeals under the deferential standards set forth in AEDPA." *Id*. at 816. Specifically,

> AEDPA limits [this court's] review to whether the state court's determination that [Smith] failed to plead sufficient facts in his Rule 32 petition to support a claim of ineffective assistance of counsel was contrary to or an unreasonable application of Supreme Court precedent. Thus, we look only to the allegations in [Smith's] Rule 32 petition and whether those allegations sufficiently state a claim for ineffective assistance of counsel.

*Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010); *see also Cullen v. Pinholster*, 563 U.S.170, 181 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). And, additional allegations raised in a federal habeas petition are not considered in reviewing the reasonableness of a state court's resolution of a claim. *Powell*, 602 F.3d at 1273 n.8. Rather, this court must evaluate only whether the Court of Criminal Appeals' determination that Smith's ineffective assistance of counsel claim failed to satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Borden*, 646 F.3d at 817-18.

Smith made no allegation in his amended Rule 32 petition that counsel were aware of the alleged circumstances surrounding his custodial statement, that he was coerced into waiving his *Miranda* rights, or that he was intoxicated or rendered

incapable of consent by a migraine headache when he signed the waiver.[34] Vol. 32, Tab 57 at 437-41. Further, Smith did not allege that he informed counsel about the alleged irregularities leading up to his statement, and he did not indicate what counsel could have done to discover the facts underlying these claims. *Id*. Because Smith failed to allege facts to establish that counsel's performance was deficient, the Court of Criminal Appeals' determination that he failed to sufficiently plead this claim was not contrary to, or an unreasonable application of *Strickland*, nor did it involve an unreasonable determination of the facts in light of the evidence presented.

### b. The Forensic Evidence

The defense strategy at trial consisted of trying "to establish that Mr. Smith's intent was to intimidate the victim so that she did not disclose her husband's philandering, but that he did not intend to kill and, therefore, was not guilty of capital murder." Vol. 38, Tab 80 at 459. Smith contends that, because his counsel conceded that Smith was present at the crime scene, challenging the forensic evidence proved critical to show that he "neither killed [the victim] nor intended to do so and, therefore, was not guilty of capital murder." Doc. 1 at 41. Allegedly, trial counsel proved ineffective due to their failure to investigate and challenge the forensic

---

[34] Smith did allege that counsel were aware that he suffered migraine headaches, but made no allegation that he told counsel he was suffering from a headache at the time of the statement. Vol. 32, Tab 57 at 440.

evidence necessary to negate Smith's specific intent to kill. *Id.* at 40-44. As Smith puts it, although the state never presented any forensic evidence to show that Smith ever struck or stabbed the victim, *id.,* and, despite Smith never indicating to law enforcement that he ever struck the victim, counsel "unreasonably and inexplicably conceded in both his opening and closing arguments that Mr. Smith struck the victim," *id*. at 42. This "unnecessary and unreasonable concession had the unfortunate effect both of confirming Mr. Smith's custodial statement and suggesting that he had concealed information to downplay his role," and "bolstered the prosecutor's improper suggestion that Mr. Smith had lied in his custodial statement when he denied stabbing or striking" the victim. *Id.*

Moreover, Smith argues that counsel exacerbated the error further by unreasonably failing to establish that the wounds to the victim's head were not fatal. Apparently, during the initial trial, "Dr. Emily Ward, the State's pathologist, testified that the cause of [the victim's] death was the stab wounds to her chest," but testified at the retrial "that it was possible that the victim's head wounds could have been fatal." Doc. 1 at 42-43. As Smith sees it, "[i]n light of trial counsel's unreasonable concession that Mr. Smith struck the victim, it was especially important . . . for the jury to understand which of the victim's wounds were fatal." *Id.* And, this purported failure to investigate and challenge the forensic evidence prejudiced Smith because

"[t]he question of the precise role that Mr. Smith played . . . was critical to a determination of whether he had the specific intent to kill necessary for a capital murder victim." *Id*. at 43.

The Court of Criminal Appeals affirmed the trial court's summary dismissal of this claim, finding that Smith "made a variety of allegations" regarding the purported "fail[ure] to adequately investigate and challenge the State's forensic evidence," but that Smith's allegations "were all conclusory and general." Vol. 45, Tab 102 at 36-38. In particular, as to the contentions regarding the failure to cross Dr. Ward about her new testimony related to the head wounds, the state appellate court held Smith "failed to provide any specific facts regarding the cross-examination trial counsel conducted, what additional questions should have been asked of the witness, how the witness would have answered those questions, and how the result of the trial would have been different if counsel had conducted that cross-examination." *Id.*

Smith argues that the appellate court's decision was based on an unreasonable determination of the facts because he "specifically alleged what trial counsel should have done and how the result of the trial would have been different." Doc. 31 at 68.[35]

---

[35]More specifically, Smith argues that:

First, Mr. Smith alleged that the State did not present any forensic evidence to support a theory that Mr. Smith stabbed or struck the victim, which was a critical fact in light of the defense strategy to show that Mr. Smith neither killed nor intended to do so and, therefore, was not guilty of capital murder. But trial counsel failed to point

But, that Smith raised these issues in his amended Rule 32 petition does not mean he is due to prevail. To begin, although Smith alleged in the petition that the state "did not present any forensic evidence to support the theory that Mr. Smith struck or stabbed the decedent," Vol. 32, Tab 57 at 449, he did not argue in the petition that his counsel rendered ineffective assistance by failing to argue the lack of forensic evidence to the jury, doc. 31 at 69. Therefore, this court cannot consider this argument in reviewing the reasonableness of the state court's resolution of this claim. *See Powell*, 602 F.3d at 1273 n.8.

Next, Smith alleges correctly that he argued in his amended Rule 32 petition that, notwithstanding the lack of supporting forensic evidence, counsel unnecessarily and unreasonably conceded that he "struck the decedent," and that this concession "bolstered the prosecutor's improper suggestion that Mr. Smith had lied in his custodial statement when he denied stabbing or striking the decedent." Vol. 32, Tab

---

that out to the jury. Moreover, despite the lack of supporting forensic evidence, trial counsel unreasonably and inexplicably conceded in both his opening and closing arguments that Mr. Smith struck the victim. *See* Vol. 15, Tab R-15 at 552 ("and my client hits the woman, too, and you will see evidence of that"); Vol. 16, Tab R-19 at 929 ("He [Mr. Smith] did hit her . . . eight times in the back he struck her"). Trial counsel's unnecessary and unreasonable concession had the unfortunate effect of both confirming Mr. Smith's custodial statement, which did not indicate that he hit Mrs. Sennett, and suggesting that he concealed information to downplay his role. It also bolstered the prosecution's improper suggestion that Mr. Smith had lied in his custodial statement when he denied stabbing or striking Mrs. Sennett.

Doc. 31 at 69 (alteration in original).

57 at 449-50. However, Smith never specifically alleged in the petition that counsel were deficient for undertaking this approach as the defense strategy. Rather, his argument appeared to be that in light of this strategy, counsel's failure to adequately challenge the forensic evidence was even more crucial to his case. In any event, Smith has not identified how counsel could have shown that a lack of forensic evidence proved he never hit the victim or lacked the intent to kill necessary for a capital conviction. Further, he has not indicated how such a showing would have affected the outcome of the trial, especially in light of Smith's confession to being at the murder scene, and several of his friends corroborated his confession at trial.[36]

---

[36] Smith's former neighbor Ralph Robinson testified that when he saw Smith after the murder, Smith became upset and confessed to being involved, telling Robinson they went to the victim's house because they were supposed to beat her up. Vol. 16 at 759-68.

Donald Buckman testified that a week or so before the murder, Smith told him he knew where they "could make some fast money." *Id*. at 779. When Buckman asked for details, Smith said "he knew this person that needed somebody beat up" and that he "needed somebody else to go with him because he did not want to go by himself." *Id.* Smith explained that he was supposed to "just go down, you know, maybe whoop the lady up and take a few things out of the house and make it look like a robbery." *Id*. at 780. And Buckman added that when he saw Smith the night after the murder, Smith's hand was "swelled up," "puffed out on top like around – you know, around the knuckles and stuff," *id*. at 788, that when he saw a VCR in Smith's house, Buckman became suspicious and stated "man, don't tell me you-all went down there and did like you said you were going to do," *id*. at 790, and that Smith replied, "yeah, we did," *id*.

Another friend, Brent Barkley, testified that during the month before the murder, he had a series of conversations with Smith, during which Smith told him that someone had approached him and had paid him "some money" to "beat somebody up." *Id*. at 809-10. Mr. Barkley further testified that the night after the murder, he noticed that Smith "had quite a substantial bit of money," and that Smith's hand was "bruised and wrapped." *Id*. at 810-13.

Smith further claims correctly that he "specifically alleged [in his amended Rule 32 petition] that Dr. Ward testified inconsistently at the first and second trials and that his '[t]rial counsel unreasonably failed to impeach Dr. Ward with her prior testimony.'" Doc. 31 at 69-70. But, as the Court of Criminal Appeals found, he "failed to provide any specific facts regarding the cross-examination trial counsel conducted, what additional questions counsel should have asked Dr. Ward, how Dr. Ward would have answered those questions, and how the result of the trial would have been different if counsel had conducted that cross-examination." Vol. 45, Tab 102 at 37. This finding was not based on an unreasonable determination of the facts. Moreover, Dr. Ward actually testified that although the head wounds were potentially fatal, "Mrs. Sennett died of multiple stab wounds of the chest and neck." Vol. 15, Tab 16 at 709. In other words, it is not exactly clear what counsel could have asked Dr. Ward to show that, as Dr. Ward testified, the victim died of the wounds to her chest and neck and not from the head wounds.

The Alabama Court of Criminal Appeals' denial of this claim was not based upon an unreasonable determination of the facts and it was not contrary to or an unreasonable application of *Strickland*.

### c. Contamination of the Crime Scene

Smith claims that counsel unreasonably failed to establish that the state contaminated evidence from the crime scene. Doc. 1 at 44-48. Allegedly, the state mishandled the physical evidence, exposing it to contamination and compromising the reliability of the evidence – in particular, the officers purportedly failed to properly wrap, transport, or store the afghan covering the victim, creating the potential for the loss of trace evidence; failed to properly package or label hair samples from the scene; and failed to appropriately label known hair samples from the suspects and Kenneth *Ray* Smith – a man who was not involved in the murder, making it unclear if the hair samples came from the petitioner Kenneth Eugene Smith, or from Kenneth *Ray* Smith. *Id*. at 44-45. Allegedly, counsel could have used this evidence in plea negotiations to give the state a "powerful incentive to consider a deal," or during the trial to cast doubt on the "critical issue" of his intent; and at the penalty stage to argue against a death sentence in light of the state's failure to live up to "high standards" for handling evidence. *Id*. at 47-48. And if counsel had "investigated and utilized such evidence," a reasonable probability purportedly existed that the jury would not have convicted Smith of capital murder and/or the judge would not have sentenced him to death. *Id*. at 48.

There is one major flaw with Smith's contention – i.e. the state did not use this evidence at the trial.[37] And, because the state did not use any of the allegedly contaminated evidence at the trial, Smith was not prejudiced by counsel's failure to argue that the state mishandled the evidence. As such, the Court of Criminal Appeals' denial of this claim was not contrary to or an unreasonable application of *Strickland*, nor was it based upon an unreasonable determination of the facts.

### d.    Hearsay Evidence

Prior to the second trial, counsel "stipulated with the district attorney that counsel would not require the state to call every witness who performed ministerial acts in connection with the chain of custody of the evidence." Doc. 1 at 48. Under the stipulation, Captain May testified that Glenn Brown, a laboratory analyst with the Department of Forensic Sciences in Huntsville, found human blood in the stolen VCR found in Smith's home. Vol. 16 at 830-31. Smith alleges that this testimony was

---

[37]As the Court of Criminal Appeals noted in affirming the trial court:

There are many reasons supporting the circuit court's denial of this claim. First and foremost, the State did not present any evidence at the *second* trial about the afghan or the hairs recovered from it. Smith's claims regarding the alleged mishandling of physical evidence and misidentification of the hair recovered from the afghan have no relevance to the evidence actually presented at the trial that resulted in conviction and death sentence he now seeks to have set aside. Therefore, even if evidence was mishandled or misidentified and even if trial counsel unreasonably failed to discover the alleged errors, as Smith claimed, Smith has failed to show that any of those alleged errors had any effect on the outcome of the proceeding.

Vol. 45, Tab 102 at 40.

inflammatory hearsay and was "used to cover the gaping hole in the State's case, *i.e.,* the lack of physical evidence connecting Mr. Smith to the crime." Doc. 1 at 49. Allegedly, counsel unreasonably failed to object to this testimony and "it was critical for trial counsel to cross-examine Mr. Brown so that the jury understood the results of his testing and, in particular, that his results did not connect that blood stain to the crime scene." *Id.*[38] And, the decision by counsel purportedly prejudiced Smith by "leaving unchallenged an inference that the victim's blood was found on the VCR." *Id*.

The trial court rejected this claim, and the Court of Criminal Appeals affirmed, finding, in part, that:

> Smith has presented no evidence to prove that the decision was not a matter of trial strategy or that the strategy was unreasonable, . . .
>
> Furthermore, Smith failed to meet his burden of proving that there is a reasonable probability that the result of his trial would have been different but for counsel's alleged errors. Smith failed to prove that, if counsel had not entered into the stipulation, the evidence about human blood being discovered on the VCR would not have been admitted. At Smith's first trial, a serologist testified that he had analyzed the blood and determined it was human but of unknown type. Smith has presented nothing to prove that the serologist would not have testified to the same

---

[38] Smith also argues that counsel should have objected to this testimony on the basis that Glenn Brown, who performed the forensic testing, did not fall within the stipulation as someone "who performed ministerial acts in connection with the chain of custody of evidence." Doc. 1 at 49. Because Smith did not raise this claim in his amended Rule 32 petition, *see* Vol. 32, Tab 57 at 453-54, this court may not consider it now in reviewing the reasonableness of the state court's resolution of the claim. *See Powell*, 602 F.3d at 1273 n.8.

facts again at the second trial, thus placing the same evidence before the jury. . . .

Vol. 45, Tab 102 at 46-47.

The court agrees that Smith cannot prove the requisite prejudice. While Smith maintains that if counsel had raised an hearsay objection, "they would have been able to counteract the inference that the victim's blood was on the VCR, which prejudicial inference the State argued to the jury and the trial court accepted in the sentencing order," doc. 31 at 78, he overlooks that Captain May clearly testified that although Brown had located human blood on the VCR, there was insufficient blood found "for him to type it," Vol. 16 at 830. In other words, Captain May did not state or imply that the state found the victim's blood on the VCR, and testified only that it was human blood. Smith has not indicated how further questioning of Brown could have prevented the jury from inferring that the blood came from the victim. Thus, the state court's adjudication of this claim was not contrary to or an unreasonable determination of the facts, and it was not based on an unreasonable determination of the facts.

### e. Intent to Kill

Smith's friend Donald Buckman testified that early one morning, Smith and Parker stopped by to see Buckman, that Smith asked if Buckman knew where Smith

could get a .38 or .45 caliber gun, and if Buckman wanted to go with them "to do the job." Vol. 16 at 781-85. Buckman testified also that he declined the invitation and that he told Smith he did not know where he could obtain a gun. *Id*. at 784-85. The state relied, in part, on Buckman's testimony to successfully oppose the motion for acquittal based on lack of intent to kill.[39] And, in its closing argument, the state also relied on Buckman's testimony to point out that "It was the defendant, Kenny Smith, as opposed to John Forrest Parker who inquired of Donald Buckman, can you get me a gun or can you get us a gun? Anywhere from a .38 to a .45," and to argue "What did they need a gun for if they were not going to kill her? . . . What did they need a gun for if they were not going to take this woman's life? That is evidence of the defendant's intent." *Id*. at 892-97.

---

[39]The prosecutor stated:

Judge, I will just say this, that the evidence of the intent to kill is corroborated. It's evidence of a circumstantial nature. All of the testimony with regard to the defendant looking for a weapon, looking for a gun, the conversations that he had with people that he tried to recruit to help him. And even though the defense's theory is that there was an intent only to harm Mrs. Sennett or beat Mrs. Sennett, that is inconsistent with someone looking for a .38 or .45 caliber gun to commit the act with. You don't beat a person with a gun. You shoot and you shoot to kill a person with a gun. There was money advanced for that purpose and we hear testimony from Donald Buckman with regard to looking for such a weapon on the very day which Mrs. Sennett was killed. The defendant in his own statement, if you look at what it said there after the initial conversations about what they were going to do to Mrs. Sennett, there is an indication that he knew that they were going to kill Mrs. Sennett not simply injure her or beat her in some way.

Vol. 16. at 872-73.

Smith contends that the visit to Buckman occurred on a different day than the murder, and that Smith's girlfriend, Ranae Bryant, "could have testified that Mr. Smith had been looking to purchase a gun for a long period of time prior to the events at issue and for lawful reasons unrelated to those events." Doc. 1 at 50. Therefore, Smith claims that counsel "unreasonably failed to establish those facts and to move in limine to exclude Mr. Buckman's highly prejudicial testimony," to effectively cross Buckman, and to call Bryant and other witnesses to establish "that the conversation about which Mr. Buckman testified did not occur on the day of the crime and had nothing to do with the crime." *Id*. To further compound the purported error, Smith argues that counsel unreasonably and inexplicably conceded in the closing argument that Smith asked Buckman if he knew where Smith could get a gun on the day of the murder. *Id.* Allegedly, because the state argued that Buckman's testimony was critical evidence of Smith's intent, a reasonable probability exists that if trial counsel had effectively challenged Buckman's testimony, the jury would not have convicted Smith of capital murder. *Id*. at 50-51.

Smith unsuccessfully raised this claim in his amended Rule 32 petition, and in affirming the trial court the Court of Criminal Appeals found that "Smith failed to allege any facts that would tend to indicate the grounds on which counsel could have successfully objected to Buckman's testimony; he failed to include any facts showing

the cross-examination trial counsel conducted and how counsel used Buckman's testimony in his closing argument; and he failed to identify specifically how he was prejudiced by counsel's alleged specific performance." Vol. 45, Tab 102 at 47-48. Smith argues that the court's decision was based on an unreasonable determination of the facts because he alleged in his amended Rule 32 petition "that trial counsel 'failed to rebut' and 'fail[ed] to challenge' Mr. Buckman's testimony that the convers[at]ion occurred on the day of the crime." Doc. 31 at 79 (citing Vol. 32, Tab 57 at 454-55) (alteration in original). But this is different from offering any facts to indicate the basis upon which counsel could have moved *in limine* to exclude Buckman's testimony, or even that counsel knew that Buckman would testify that Smith asked him on the day of the murder about obtaining a gun, or what further questions counsel could have asked Buckman to get him to change his testimony regarding when the conversation occurred. In any event, counsel in fact asked Buckman on cross if he could have been mistaken about the date Smith and Parker came to his house, and if that occasion was the first time Smith had asked him about a gun. Vol. 16 at 793-95. Buckman answered that, to the best of his knowledge, he believed he had the right date and that it was indeed the first time Smith had asked him about a gun. *Id*. Counsel also elicited testimony from Buckman that Smith never indicated that he or his cohorts planned to kill the victim. *Id*. at 795-97. What more,

if anything, counsel could have done on cross are not matters to be assessed through the "distorting effects of hindsight." *Strickland*, 466 U.S. at 698. Rather, the court must "evaluate the conduct from counsel's perspective at the time" of the trial. *Id.* And, here, Smith has offered only conclusory allegations that his conversation with Buckman about the gun occurred on a different date and that his girlfriend "could" have testified that Smith had tried to buy a gun for legitimate purposes "for a long period of time" before the murder. These contentions fall short of meeting his burden.

Likewise, Smith's contention related to alleged prejudice is unavailing. Smith contends that "he was prejudiced because his intent was the critical issue at trial, and the State used Mr. Buckman's testimony as unrebutted evidence in support of its argument that Mr. Smith had an intent to kill." Doc. 31 at 79. Again, however, Smith offered nothing more than this conclusory allegation to support his contention of prejudice related to counsel's purported failure to somehow prevent Buckman from testifying that Smith asked him about a gun on the day of the murder.[40] As noted previously, counsel crossed Buckman extensively and Smith has failed to offer any specifics on what else counsel could have done.

_____

[40] Smith argues also that because counsel failed to rebut Buckman's testimony, instead conceding its accuracy, "during closing [arguments,] counsel was forced to explain the testimony by making the improbable argument that the inquiry about a gun was consistent with counsel's theory that the crime was a planned assault." Doc. 31 at 79. However, because Smith did not make this argument in his amended Rule 32 petition, this court may not consider it now in reviewing the reasonableness of the state court's resolution of the claim. *See Powell*, 602 F.3d at 1273 n.8.

The Court of Criminal Appeals' adjudication of this claim was not contrary to or an unreasonable application of *Strickland*, nor was it based upon an unreasonable determination of the facts.

### f. Statements That the Crime Involved Capital Murder

Smith takes issue with statements his trial counsel made in opening argument – i.e. "what happened to [Mrs. Sennett] to be sure it was a capital murder," Vol. 15, Tab 15 at 541, – and in closing, i.e. "[t]here was a capital murder at Mrs. Sennett's house on the 18th of March . . . [b]ut that capital murder had nothing to do with Kenny Smith's state of mind," Vol. 16, Tab 19 at 906. Counsel followed both statements by arguing that Smith was not guilty of capital murder because he lacked the intent to kill. Vol. 15, Tab 15 at 542-43; Vol. 16, Tab 19 at 906.

Smith claims counsel acted unreasonably by referring to the crime as capital murder "because counsel conceded that Mr. Smith committed a crime that day, and Mr. Smith was the only defendant that the jury could hold responsible for what counsel conceded was a capital murder." Doc. 1 at 51. Allegedly, counsel's statements confused the jury by basing the defense on distinguishing between capital murder for which specific intent is an element and other crimes for which it is not, as evidenced by the jury's note during deliberations that stated: "We need the differences listed between capital murder and murder while acting with extreme

indifference to human life, definition/elements." *Id.* at 51-52 (quoting Vol. 17, Tab 21 at 1001-02). And, "[b]ecause trial counsel argued that Mr. Parker had stabbed Mrs. Sennett and that the crime constituted 'capital murder' and did not object when the prosecutor linked Mr. Parker's actions and intent to Mr. Smith, there is a reasonable probability that the jury concluded that Mr. Smith also was guilty of capital murder even if the jury did not believe that Mr. Smith had the specific intent necessary to support such a conviction." *Id.* at 52. Moreover, "the prejudice to Mr. Smith from trial counsel's repeated references to 'capital murder' and concession that Mr. Parker had committed 'capital murder' were purportedly exacerbated by trial counsel's failure to object when the prosecutor repeatedly imputed Mr. Parker's actions and intent to Mr. Smith." *Id.*

The Court of Criminal Appeals affirmed the trial court's summary dismissal of this claim, noting that "the claim included only conclusory allegations of deficient performance and prejudice," that "[t]he trial court [correctly] dismissed the claim because Smith did not plead any facts that would indicate that he was prejudiced by counsel's reference to the crime as a capital murder," and that "Smith failed to allege any facts indicating the context in which trial counsel referred to the crime as a 'capital murder,' he did not allege any facts to show that counsel's use of the term was unreasonable, and he did not allege any facts indicating how the references

prejudiced him." Vol. 45, Tab 102 at 49-50. Smith alleges that the court's decision is an unreasonable determination of the facts because counsel's references to capital murder confused the jury due to Smith's pursuit of a defense based on distinguishing capital murder from lesser crimes and the state following counsel's concession that a capital murder had occurred by imputing Parker's intent to Smith. Doc. 31 at 80. But, as the state court noted, Smith offers no facts to support his contentions. Therefore, the Court of Criminal Appeals' determination that Smith's conclusory allegations were insufficient to satisfy the pleading requirements of Rule 32 was neither contrary to nor an unreasonable application of *Strickland* and it was not based upon an unreasonable determination of the facts.

### g. Failure to Mount a Defense

Smith challenges next counsel's failure to "call any witnesses or submit any evidence in a defense case," arguing that:

> 163. Trial counsel did not call pathology or forensic expert witnesses to explain that the forensic evidence did not support the State's theory of the crime. Nor did trial counsel call witnesses who would have testified about Mr. Sennett's history of infidelity, spousal abuse, and mental instability, including Mr. Sennett's paramour and Mrs. Sennett's counselor. Trial counsel did not call an expert in police procedure to testify that the search warrant and Mr. Smith's custodial statement were obtained in violation of proper police procedure.

> 164. Trial counsel also did not call witnesses to rebut Mr. Buckman's testimony that Mr. Smith was looking to purchase a gun on the day of

the crime. That conversation did not take place on the day of the crime. In addition, Mr. Smith had been looking to purchase a gun prior to the events at issue and for lawful reasons unrelated to those events. There were witnesses available, including Ranae Bryant, who would have testified to those facts. But defense counsel failed to call them to rebut Mr. Buckman's testimony.

165. Mr. Smith was prejudiced by trial counsel's unreasonable failure to put on a defense case because critical evidence was not addressed and the State was able to encourage the jury to draw inferences that were not warranted by the true facts. Had trial counsel done an adequate investigation and put on a defense case, there is a reasonable probability that Mr. Smith would not have been convicted of capital murder.

*Id*. at 52-53.

The Court of Criminal Appeals affirmed the trial court's summary denial of this claim, finding the claim "vague and conclusory" and involved "unnamed 'pathology or forensic expert witnesses,' and an unnamed 'expert in police procedure,'" and that "Smith named or vaguely identified other witnesses that he said trial counsel should have called . . . but he failed to plead any specific facts about how the failure to present their testimony resulted in prejudice to him." Vol. 45, Tab 201 at 50. To Smith, the rejection of the claim is an unreasonable determination of the facts because he "not only named witnesses who trial counsel should have called, but also pleaded facts about how the failure to call them prejudiced him." Doc. 31 at 81. While Smith may be correct that he alleged counsel should have called "pathology or forensic expert witnesses" to "explain that the forensic evidence did not support the state's

theory of the crime," he failed to identify who would have testified as expert witnesses, what they would have testified about, or how the failure to present such testimony prejudiced the defense. Similarly, although Smith alleged that counsel failed to call "an expert in police procedure," he did not indicate who might have testified as an expert in police procedure that the search warrant and Smith's custodial statement were obtained in violation of "proper police procedure," what their testimony would have been, or how the failure to present such testimony prejudiced the defense.

And, as for the contention that counsel should have called Mr. Sennett's paramour and his counselor to testify about the Sennetts' marital issues, again, Smith failed to allege what their testimony would have been and how the failure to present such testimony prejudiced the defense. Finally, although Smith makes the conclusory allegation that Ranae Bryant and Buckman's nephew would have testified that Smith's conversation with Buckman about a gun "did not occur on the day of the crime and had nothing to do with the crime," he has offered nothing to indicate that either of them had direct knowledge of the conversation, that they were available to testify, or details of what testimony they were prepared to offer, and Smith offered no specific facts to indicate how their absence prejudiced the defense.

For all these reasons, the Court of Criminal Appeals' adjudication of this claim was not contrary to nor an unreasonable application of *Strickland* and it was not based upon an unreasonable determination of the facts.

### h.    Failure to Object to Prosecutorial Misconduct

Smith also challenges his trial counsel's purported unreasonable failure to object when the prosecutor "repeatedly engaged in highly improper and prejudicial misconduct." Doc. 1 at 54. More specifically, Smith cites the following conduct by the prosecutor:

1.    The prosecutor stated that Smith watched "movies on Mrs. Sennett's VCR that still had her blood splattered all over it," doc. 1 at 54-55,[41] notwithstanding the fact that Captain May had testified that the amount of blood on the VCR was insufficient to determine the blood type, i.e. to whom it belonged, *id.* at 55 (citing

---

[41] In context, the prosecution made the following argument in its rebuttal closing statement:

Now [defense counsel] talks about [Smith] being so upset, so upset and so torn up over what happened to Elizabeth Sennett, what happened out there at that residence on Coon Dog Cemetery Road on the 18th, so upset that he could not play cards, but he could bring that bloody VCR into his house and he could sit there and play tapes and watch movies on Mrs. Sennett's VCR that still had her blood splattered all over it. And he tells you that it was never, never Kenneth Smith's intent for that woman to die. Well, what did he do to stop it? He had every opportunity when he was out there in that house and he saw John Forrest Parker with that knife. If he did not intend for that woman to die, why didn't he say, stop, John, we have already beat her up? This isn't the plan. He never did that. He never took one step toward stopping what happened that day.

Vol. 17, Tab 20 at 946-47 (alterations added).

Vol. 16 at 830). As Smith puts it, this statement conveyed the impression that the prosecution had knowledge of evidence that was not offered at trial, and "induced the jury to trust the prosecutor's judgment as to the source of the blood on the VCR rather than the jury's own view of the forensic evidence (or lack of forensic evidence) presented during the trial." *Id*.;

      2.    The prosecutor argued, without objection, that Smith was an "instigator" and "active leader" in the murder, even though the defense's theory of the crime contended that Mr. Sennett "instigated a murder for hire." Doc. 1 at 56;[42]

      3. The "prosecutor argued that certain words and phrases, such as 'hurt' and 'beat up,' . . . in Mr. Smith's custodial statement (written by Captain May), were merely euphemisms for murder." *Id*.[43]; and

---

[42] In context, the prosecution argued the following in its closing statement:

And I said to you awhile ago that you can't shift the responsibility in this case for what Kenny Smith did to someone else. He was a leader. He was an instigator in this thing. Maybe down the line somewhere, maybe he did not get it kicked off like Charles Sennett did, maybe he did not deliver the money like Billy Williams did, but he was in there as an active leader in this thing right up to the very end. And why do I say that? Who was it that Billy Williams talked to first? It's right here in the statement. He first talked to Kenny Smith. Billy Williams who was the direct line back to Charles Sennett talked to Kenny Smith about a month prior to this incident taking place.

Vol. 16, Tab 18 at 894-95.

[43] In context, during the state's closing argument, the prosecution argued:

Also, he says in his statement on page 4 that at the time he and John Forrest Parker

4. The prosecutor repeatedly expressed his personal opinions concerning the evidence and the credibility of witnesses by saying, in part, that "Defendants are going to tell their story in the light most favorable to themselves. They always do. And I submit to you that's what the defendant has tried to do here, . . .," Vol. 16, Tab 18 at 900), and that Smith's statement was the most reliable and appropriate way to take a statement, even though Captain May had testified that "he violated his own procedures by taking a statement from Mr. Smith with no one else present."[44] Doc. 1 at 57.

Smith asserts that trial counsel's failure to object to these purported instances of prosecutorial misconduct permitted the jury to reach a verdict "based on a warped

---

were going out there, he says "at this time we still did not know how we were going to kill Mrs. Sennett." Talking about killing. Now, they may have started out using euphemisms, but as they get on in the statement, talking about what happened that day and what occurred they use the – he uses the word "kill," he uses the word "murder," which I submit to you was his intent all along.

Vol. 16, Tab 18 at 892-93. Smith argues that counsel should have objected to this argument because: Nothing in evidence suggested that Mr. Smith had ever used those or any other words as euphemisms for murder. In fact, three State witnesses, Ralph Earl Robinson, Donald Larry Buckman, and William Brent Barkley, each testified that Mr. Smith had only mentioned "beating up" someone in a robbery.

Doc. 1 at 56.

[44] Captain May testified that when conducting witness interviews, he "tr[ies] to have two people in the room, if possible." Vol. 16 at 854 (alteration added). This is different than Smith's contentions that Captain May "violated his own procedures by taking a statement from Mr. Smith with no one else present."

view of the facts." Doc. 1 at 56. Likewise, he claims that counsel's failure to object to the prosecutor's personal opinions allowed the prosecution to "bolster parts of Mr. Smith's custodial statement that were favorable to the State's case while disparaging parts that were not consistent with the State's case." *Id*. at 58. Allegedly, a reasonable probability existed that the jury would not have convicted Smith of capital murder if counsel had objected. *Id*.

A prosecutorial misconduct claim requires a showing that the challenged remarks were improper and that they prejudicially affected Smith's substantial rights. *See Sexton v. Howard*, 55 F.3d 1557, 1559 (11th Cir. 1995). It is not enough that the comments were "offensive," "improper," "undesirable or even universally condemned," *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), and "[p]roper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair," *Spivey v. Head*, 207 F.3d 1263, 1276 (11th Cir. 2000). Relevant here, closing arguments are meant to "assist the jury in analyzing, evaluating and applying the evidence." *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984). While a defendant may disagree, in general, a prosecutor may comment on the evidence and express the conclusions she believes a jury should draw from that evidence. *See United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). For this reason, improper comments by a prosecutor require a new trial only if they "so infected the trial with

unfairness as to make the resulting conviction a denial of due process." *Darden*, 477

U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). Moreover,

"[c]laims of prosecutorial misconduct are fact-specific inquiries which must be

conducted against the backdrop of the entire record." *United States v. Hall*, 47 F.3d

1091, 1098 (11th Cir.1995). And, "[i]mproper statements during argument can be

cured by clear and accurate jury instructions." *Johnson v. Alabama,* 256 F.3d 1156,

1185 (11th Cir. 2001).

Turning to the specifics here, Smith alleges that counsel should have objected

during the state's closing argument and rebuttal closing argument, when the

prosecutor argued facts that were not in evidence and expressed his personal opinions

concerning the evidence. Doc. 1 at 54-57. Smith unsuccessfully raised these claims

in his amended Rule 32 petition, Vol. 32, Tab 57 at 465-71, and in affirming the trial

court, the Court of Criminal Appeals stated as follows:

> Smith alleged the specific statements that he believed constituted
> prosecutorial misconduct, but he failed to plead any facts indicating the
> context in which those statements were made. Smith did not allege
> specific facts in his amended petition regarding the crime and the State's
> evidence or the defense theory, and he did not plead any facts regarding
> the prosecutor's entire argument to show the context in which the
> allegedly improper arguments arose. Smith also did not plead any facts
> to show that, if counsel had objected to the allegedly improper conduct,
> that the trial court would have sustained the objections, or that the result
> of the proceeding would have been different. Additionally, Smith
> alleged only in a conclusory and general way that he was prejudiced by

trial counsel's failure to object to some of these prosecutorial comments, but he failed to plead any facts indicating how he was prejudiced. As the claims were pleaded, it is impossible for this Court to determine whether Smith would be entitled to relief, even if the allegations were true. *See Bracknell v. State*, 883 So. 2d 724 (Ala. Crim. App. 2003). . . .

We note, too, that the trial court instructed the jury repeatedly that the arguments of counsel were not evidence. Jurors are presumed to follow the trial court's instructions. *Calhoun v. State*, 932 So. 2d 923, 962 (Ala. Crim. App. 2005). We have carefully reviewed the arguments Smith now claims trial counsel should have objected to, and the context in which those comments were made. We agree with the finding of the circuit court: "Each statement by the prosecutor complained of herein falls within the right of the prosecutor to draw and argue reasonable inferences from the evidence, and the failure to object thereto does not amount to ineffective assistance of counsel." (C. 126.)

Vol. 45, Tab 102 at 52-54 (alteration in original) (footnote omitted).

The Court of Criminal Appeals' dismissal of these claims as insufficiently pleaded is not unreasonable. Smith made only general allegations in his amended Rule 32 petition, singling out instances of alleged prosecutorial misconduct without addressing them in the context of the entirety of the prosecution's closing argument or the rest of the trial. Further, Smith made no allegation that his trial was rendered fundamentally unfair by counsel's failure to object to the alleged instances of prosecutorial misconduct, that the court would have sustained counsel's objections, or that the jury would have rendered a different verdict if counsel had objected to

these statements. Finally, he made only a conclusory allegation that he suffered prejudice as a result of counsel's failure to object to these arguments.

Further, the Court of Criminal Appeals' alternative holding is not unreasonable. Viewed in context of the trial as a whole, and the context of the entirety of the state's closing arguments, the comments were not improper. Rather they were comments based upon the evidence that the prosecutor used to illustrate the state's theory that Smith had the requisite intent to kill the victim. And, significantly, even assuming the comments were improper, the trial court instructed the jury on multiple occasions that arguments or statements made by the attorneys were not evidence and should not be considered as such. Vol. 14, Tab 13 at 518; Vol. 16, Tab 18 at 889; Vol. 17, Tab 21 at 962. Jurors are presumed to follow the court's instructions, *see Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and "improper statements during argument can be cured by clear and accurate jury instructions," *Johnson*, 256 F.3d at 1185.

Considered in the context of the entire trial, the prosecutor's comments neither rendered the trial fundamentally unfair, nor infected the trial with such unfairness that the resulting conviction amounted to a denial of due process. And, because the underlying claims of prosecutorial misconduct lack merit, trial counsel were not ineffective for failing to object to the alleged misconduct.

## 2. Ineffective Assistance of Counsel in the Penalty Phase

Smith claims also that counsel provided ineffective assistance at the penalty phase based on a purported conflict of interest. This contention centers on testimony at the penalty phase that Smith provided information to one of his jailers that may have saved that individual's life. Specifically, counsel for Smith called one of the guards at the county jail where Smith was held in pretrial custody. Vol. 17, Tab 27 at 1057-96. The guard testified that Smith gave him a note saying "something was about to happen, he did not know what or when, but something was up." *Id*. at 1071-72. After receiving the note, the guard became suspicious of two other prisoners at the jail. *Id*. at 1072-74. Smith later told the guard that he could not "stand by and let it happen again," *id*. at 1075, that the other two prisoners were constantly talking about what was going to happen, and that Smith "did not know exactly if it was going to be like day or night when it was going to happen," *id*. at 1075-76. Subsequently, the guard found a knife made from a tube of toothpaste, a shank razor, and a rope made from bed sheets in or around the cell shared by the other two inmates. *Id*. at 1078-83. The guard testified that although he does not know what the two inmates had planned to do with the knife and rope, he believes that Smith saved him from a violent attack, *id*. at 1085, and that neither of the two inmates ever knew how Smith

had helped him out, and that Smith never asked for any favors in exchange for the information he gave the guard, *id*. at 1087.

The defense also called James Aiken, an expert in correctional issues, who testified that he had reviewed Smith's prison records and met with the guard in question. Vol. 18 at 1274-1308. Aiken testified that Smith had a good record in custody and opined that it would be appropriate to house Smith in a maximum security prison rather than death row. *Id*. at 1283-99. He added that his "meeting with [the guard] and learning what had happened and the information that Mr. Smith had given him, the warnings" influenced his professional opinion as to "how [Smith] ought to be classified and whether or not he pose[d] a risk of violence to others in the institution." *Id*. at 1294.

The state aggressively cross-examined the guard and Aiken, repeatedly challenged the existence and seriousness of the plot against the guards at the jail, and elicited both to admit that they had no proof of an actual plot against the guard. Vol. 17, Tab 27 at 1090, 1092; Vol. 18 at 1305-06. Based on these cross examinations, Smith argues that his counsel did not push back because one of his attorneys also represented one of the co-conspirators in the alleged plot against the guard. Doc. 11 at 4. Smith contends that his lawyer "learned of the incident when he was informed

that the details of the plot discussed by [the guard] would be used against [the inmate in question] at his trial." *Id*. As Smith puts it,

> The focus of the prosecution's cross-examination of [the guard] and Mr. Aiken illustrates trial counsel's irreconcilable conflict of interest. Eliciting any further details on the seriousness of . . . [the] plot to rebut the prosecution's arguments at the penalty and sentencing phases of Mr. Smith's trial would have been contrary to the interests of [the inmate at issue], another of [counsel's] clients. Indeed, trial counsel already had been informed that the plot, which Mr. Smith had revealed, would be used against [the inmate at issue] in the course of his capital murder trial. In his closing remarks, trial counsel was forced to concede that "whether there was actually an attempt to do any of those things, whether or not events went beyond the line of the attempt and but for the intervention of [the guard] would have succeeded either against [the guard] himself or the guards, we will never know. We will never know that."

Doc. 11 at 5. As for prejudice, Smith argues that "[a]llowing the prosecution to downplay the seriousness of the plot . . . undermined the credibility of Mr. Smith's expert on his likely future behavior, and diminished the significance of Mr. Smith's post-incarceration conduct, . . ." and that "[b]ecause the trial court determined that the mitigating factors presented by the defense were outweighed by a single aggravating factor, and Mr. Smith's conduct while in prison was central to trial counsel's mitigation strategy, [counsel's] conflict prejudiced Mr. Smith by making it impossible to give appropriate weight to the mitigation evidence." *Id.* at 5-6.

Smith unsuccessfully raised this claim in his amended Rule 32 petition, and the Court of Criminal Appeals affirmed the trial court, finding in part "that Smith failed to satisfy his burden to plead a clear and specific statement of the grounds for relief, including a full disclosure of the factual basis for those grounds" and that "[t]he circuit court correctly held that Smith failed to include anything beyond general allegations that a conflict existed and he pleaded no facts regarding any additional actions counsel would have taken or evidence he would have presented if he had not been under an alleged conflict of interest." Vol. 45, Tab 102 at 57-58.[45] Smith alleges that this decision is contrary to or an unreasonable application of federal law and is based upon an unreasonable determination of the facts. Doc. 33-1 at 4. But a review of the amended Rule 32 petition indeed shows that Smith made only general, conclusory allegations that a conflict existed. Smith offered no facts regarding any additional actions counsel could have taken or the evidence counsel could have presented but for the alleged conflict of interest. Thus, the Court of Criminal Appeals' dismissal of these claims as insufficiently pleaded is not unreasonable.

Alternatively, this claim fails on the merits. "Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to

---

[45] The state court's dismissal of this claim based upon Rule 32.6(b) of the Alabama Rules of Criminal Procedure constitutes a ruling on the merits for AEDPA purposes. *See Frazier v. Bouchard*, 661 F.3d 519, 526-27 (11th Cir. 2011).

representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U. S. 261, 271 (1981). "Ineffective assistance of counsel claims in the conflict of interest context are governed by the standard articulated by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)." *Reynolds v. Chapman*, 253 F.3d 1337, 1343 (11th Cir. 2001). Under the two-part *Cuyler* test, to establish that an attorney is constitutionally ineffective due to a conflict of interest, a petitioner must demonstrate that the attorney had an actual conflict of interest, and that the conflict adversely affected her performance. *Cuyler*, 446 U.S. at 348-49. Prejudice for *Strickland* purposes is presumed under the *Cuyler* test, but only if the petitioner "demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (quoting *Strickland v. Washington*, 466 U. S. at 692). But the conflict must be actual and not merely speculative, as the mere possibility of a conflict does not violate the Sixth Amendment. *Cuyler*, 446 U.S. at 348-49. To show that an actual conflict exists, the petitioner must "point to specific instances in the record to suggest an actual conflict or impairment of their interests," and "must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.

If he did not make such a choice, the conflict remained hypothetical." *Smith v. White*,

815 F.2d 1401, 1404 (11th Cir. 1987). And, if a petitioner establishes the existence

of an actual conflict of interest, *Cuyler* requires next that the petitioner show that the

conflict adversely affected the representation he received. To do so,

> a habeas petitioner must satisfy three elements. First, he must point to some plausible alternative defense strategy or tactic [that] might have been pursued. Second, he must demonstrate that the alternative strategy or tactic was reasonable under the facts. Because prejudice is presumed, the petitioner need not show that the defense would necessarily have been successful if [the alternative strategy or tactic] had been used, rather he only need prove that the alternative possessed sufficient substance to be a viable alternative. Finally, he must show some link between the actual conflict and the decision to forgo the alternative strategy of defense. In other words, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999) (alterations in original)

(citations and quotations omitted).

Turning now to the specifics here, for the actual conflict of interest prong,

Smith argues that counsel failed to elicit "further details on the seriousness of [the]

plot to rebut the prosecution's arguments" because the details would have been

contrary to the interests of counsel's other client. Doc. 33-1 at 5. While Smith implies

that "further details on the seriousness of [the] plot" were available to counsel, and

that counsel purportedly did not elicit those details due to his loyalty to his other

client, Smith failed to plead any facts to support such a finding. The record shows that the guard testified that Smith warned him of an impending plot by the other two prisoners, but that the guard could not give actual details about the plot because it never materialized. In other words, there is no evidence that further details concerning the plot existed that counsel or anyone else could have uncovered.

As for the adversely affected prong, this prong requires Smith to point to a plausible alternative defense strategy or tactic that counsel could have pursued and he must demonstrate that the alternative strategy was reasonable under the facts. *See Freund*, 165 F.3d at 860. Smith failed to make this showing. In fact, it appears that counsel made the best use of the limited facts available to portray Smith as a model prisoner.

To close, Smith has failed to establish the existence of an actual conflict of interest or that the alleged conflict adversely affected counsel's performance.

**Claim C.    Whether The Prosecution Violated Smith's Fifth and Fourteenth Amendment Rights by Failing to Comply with its Discovery Obligations under *Brady v. Maryland***

Smith claims that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by destroying and by failing to disclose evidence. In *Brady*, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. A *Brady* violation requires a showing that: "(t)he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[T]here is no suppression, and thus no *Brady* violation, if either the defendant or his attorney knows before trial of the allegedly exculpatory information." *Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir. 1995). "The prejudice or materiality requirement is satisfied if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320,1334 (11th Cir. 2012) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Materiality is determined by asking whether the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict. *See Kyles v. Whitley*, 514 U.S. 419, 434, 436-37 & n. 10 (1995).

At issue here are Smith's contentions that the state destroyed an "audiotaped conversation with an anonymous informant" and failed to inform him that a "forensic investigator had determined that a hair consistent with the known hair of Kenneth

Ray Smith – not Petitioner Kenneth Eugene Smith – had been recovered from the crime scene." Doc. 1 at 62. The court addresses each contention in turn.

### 1. Audiotape of Conversation with Anonymous Informant

The Alabama Court of Criminal Appeals found the following facts concerning the anonymous caller:

> The record reflects that after Sennett's murder, the State offered a $10,000 reward for information concerning Sennett's death. Capt. Ronnie May of the Colbert County Sheriff's Department testified that an anonymous caller contacted the Crimestoppers program telephone number for the sheriff's department and said that she had information about the Sennett murder. She told police that she wanted to remain anonymous and that she would not give any information unless she did not have to disclose her name or testify at trial. She was assigned a number, 569S, and told to give the police this number whenever she called. May testified that the caller told police that three people – Smith, Parker, and Williams – were involved in the murder, she gave their addresses, the makes of their cars, and said that a VCR that had been taken from the Sennett's house was in Smith's house and that Parker had a knife. She said that Smith participated in the murder and that he did so for money and that Parker actually stabbed Sennett. May said that Caller 569S telephoned police several times to relay information. During the last telephone conversation she told police the identification number of the VCR stolen and gave a description of it to police. May stated that he then applied for a warrant to search Smith's house. May further testified that the police never knew the caller's identity.

*Smith*, 908 So. 2d at 284-85 (footnote omitted).

Ricky Miller, an investigator for the Colbert County District Attorney's office, testified at the June 27, 1994 suppression hearing that he spoke with the anonymous

informant on the phone several times, Vol. 11 at 277, and that he taped one of the conversations "as a way of keeping up with what they said," but subsequently erased the tape "once [he] transferred [the content] to the form". *Id.* at 278. Smith claims that the state should have preserved and disclosed to him the tape recorded conversation because the "informant provided exculpatory information to the investigators, including that Mr. Parker – not Mr. Smith – stabbed Mrs. Sennett." Doc. 1 at 62. He contends that the destruction of the recording violated *Brady* and prejudiced him by depriving him of important evidence that he did not stab the victim. *Id.* at 63. But, this claim, which Smith raised for the first time in his amended Rule 32 petition, is procedurally barred from review in this court. As the trial court noted when it summarily dismissed the claim, Smith could have raised this claim at trial or on direct appeal, and, in light of his failure to do so, it was "precluded pursuant to 32.2(a)(3 & 5), Alabama Rules of Criminal Procedure." Vol. 36, Tab 73 at 137.[46] Claims barred under Rules 32.2(a)(3) and (a)(5) of the Alabama Rules of

---

[46]Smith arguably raised this claim in a footnote in his brief on appeal from the denial of his Rule 32 petition in which he referenced two audiotapes. Vol. 42, Tab 86 at 59-60, n.13 (alteration added). Smith has not raised a claim concerning a second audio tape recording in this court. Doc. 31 at 92 ("Mr. Smith's *Brady* claim in this Court is not premised on the existence of additional audiotaped conversations with the informant." In any event, based on this footnote, the Alabama Court of Criminal Appeals questioned "whether Smith's argument in his brief satisfies the requirement of Rule 28(a)(10), Ala. R. App. P." However, the court ultimately held that Smith's *Brady* claim was procedurally barred "by Rule 32.2(a)(3) and Rule 32.2(a)(5) because it could have been raised at trial and on appeal, but was not." Vol. 45, Tab 102 at 10-11. And, Smith "did not allege that the evidence was not known to him in time to raise the issue in a post-trial motion or on

Criminal Procedure are procedurally barred from habeas review in this court. *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1335 (11th Cir. 2012) (citing *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) ("The district court correctly determined that the claims . . . are procedurally defaulted under Rules 32.2(a)(3) and (5) because they were not raised either at trial or on appeal.") and *Holladay v. Haley*, 209 F.3d 1243, 1254 & n. 9 (11th Cir. 2000) (finding claims dismissed under Rule 32.2(a)(5) to be procedurally defaulted in federal court)).

Smith challenges this conclusion by maintaining that the state courts incorrectly found that his claim was procedurally barred. As Smith puts it, he "did raise the State's destruction of an audiotaped conversation with the informant in his *Brady* claim on direct appeal" when he stated in his brief supporting his petition for a writ of certiorari that the state "did record at least one telephone conversation with [the anonymous caller], but destroyed that tape and neglected to make any others, preventing the defense from hearing her voice." Doc. 31 at 91 (quoting Vol. 28, Tab 42 at 36). Mentioning the issue on appeal is not akin to actually litigating the claim below. And, indeed, Smith failed to raise in his brief to the Court of Criminal Appeals the claim concerning the destruction of the tape recording. Vol. 25, Tab 36 at 31-38. Instead, Smith claimed on direct appeal only that the state had a duty to

appeal." (Vol. 45, Tab 102 at 11).

discover the identity of the anonymous informant and disclose her name to him, *id.*, and the sentence in Smith's brief in support of his certiorari petition was part of the argument in support of this contention.

Alternatively, a finding that the single sentence in the certiorari petition was sufficient to raise the issue does not help Smith. To begin, Smith waived the claim by failing to include it in his brief to the Court of Criminal Appeals, and a party cannot raise an issue to a higher court he never raised below. In that respect, the Court of Criminal Appeals finding that he did not raise the claim at trial or on direct appeal was correct, and the claim is barred from review in this court. Moreover, the claim fails also, as the Court of Criminal Appeals found, based on Smith's failure to plead sufficient facts to support a *Brady* claim:

> Smith's petition discloses that he was aware at trial that an investigator had erased one audiotape. The trial record clearly indicates that Smith was well aware that law enforcement authorities had many conversations with the informant, and also that he was aware of the substance of the conversations with the informant. Smith pleaded no facts about the alleged contents of the second audiotape, or how disclosure of the audiotape would probably have led to a different result at trial or at sentencing. Thus, Smith did not plead sufficient facts to support a *Brady* claim, and the claim was properly dismissed.

Vol. 45, Tab 102 at 10-11.

To prove a *Brady* violation, Smith must show that the evidence was favorable to him, either because it is exculpatory or because it is impeaching; that it was

suppressed by the state, either willfully or inadvertently; and that prejudice ensued. *See Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1334-35 (11th Cir. 2012). As Smith puts it, because "[a] critical aspect of the defense strategy for the guilt/innocence and penalty phases was to establish that Mr. Parker – not Mr. Smith – inflicted the fatal stab wounds," the destruction of the tape deprived him of "important evidence to establish that fact." Doc. 1 at 63. Allegedly, "[t]he informant's evidence would have been critical at the culpability phase because it bears on Mr. Smith's intent, which is a necessary element of capital murder." Doc. 31 at 90 (citations omitted). But prejudice is established "only if the suppressed information is itself admissible evidence or would have led to admissible evidence." *Spaziano v. Singletary*, 36 F.3d 1028, 1044 (11th Cir. 1994). The tape recording of the anonymous Crimestoppers phone call is inadmissible hearsay – Smith would have offered it for the truth of the matters alleged by the caller, i.e. that Smith did not stab the victim. And, Smith has identified no admissible evidence that could have come from the recording. To the extent Smith contends he could have used the tape to identify the anonymous caller, her testimony concerning who inflicted the fatal stab wounds on the victim would also have been inadmissible hearsay as there is no evidence that the caller had first hand knowledge of the crime itself.

Smith cannot establish that the destruction of the tape recording prejudiced him in violation of *Brady*. Thus, the Court of Criminal Appeals' dismissal of the claim was neither contrary to, nor an unreasonable application of *Brady*.

### 2.     Willful Ignorance of Identity of Anonymous Informant

Smith also argues – for the first time in his reply brief – that the state violated *Brady* by "remain[ing] willfully ignorant of the informant's identity." Doc. 31 at 88. "[A]rguments raised for the first time in a reply brief are not properly before a reviewing court." *Herring v. Secretary, Dep't of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) (quoting *United States v. Coy*, 19 F.3d 629, 632 n. 7 (11th Cir.1994)). Moreover, on direct appeal, Smith unsuccessfully claimed that the police had a duty to discover the identity of the anonymous caller and to provide that information to him. As the Court of Criminal Appeals found, however, "there is absolutely no evidence that any *Brady* violation occurred," and that Smith cannot establish the relevant test to show a *Brady* violation "because there is no dispute that the State did not know the identity of the anonymous caller." *Smith*, 908 So. 2d at 286. Additionally, as discussed above, any evidence the anonymous caller might have offered at trial concerning who stabbed the victim would have been inadmissible hearsay. Thus, Smith is also unable to prove that he suffered any

prejudice by not knowing the identity of the caller. Therefore, the Court of Criminal Appeals' finding that no *Brady* violation occurred was not unreasonable.

### 3.     Hair Found at the Crime Scene

Smith also pleads a *Brady* violation related to a forensic report concerning hair found at the crime scene. Specifically, investigators found the victim partially covered with a blue and white afghan. Vol. 15, Tab 16 at 574. During the investigation, Colbert County Investigator Doug Hargett sent blood, hair, and saliva samples of Smith and the other two suspects (John Forrest Parker and Billie Gray Williams) to the Alabama Department of Forensic Science for serology testing. Vol. 39, Tab 81 at 696. A couple of days later, Hargett also sent hair samples from the victim's husband and a Kenneth *Ray* Smith "for the purpose of elimination." *Id*. at 700. Thereafter, a criminalist from that department, John Kilbourn, examined the evidence from the crime scene, including the blue and white afghan, and prepared a five-page report detailing the evidence he examined and his conclusions. *Id*. at 675-679. On the first page, Kilbourn noted that the report pertained to "[the victim], John Forrest Parker, suspect[,] Kenneth Eugene Smith, suspect[, and] Billie Gray Williams, suspect." *Id*. at 675 (alterations added). On page two, Kilbourn noted that he had received for analysis "[t]hree sealed envelopes each containing a known head hair sample and identified as containing hair from Kenneth E. Smith, Billie G. Williams and John F.

Parker." *Id*. at 676 (emphasis added). On page five of the typed report, he noted that

he had also received the "[k]nown head hair of [the victim's husband]" and the

"[k]nown head hair of Kenneth Smith." *Id*. at 679. At some point, someone added

"Ray" in handwriting between Kenneth and Smith. *Id*. Finally, in the results section

of his trace evidence report, Kilbourn found:

> Hairs recovered from the cap (item 8) were similar in many
> characteristics to the known head hair of Kenneth Eugene Smith. These
> possibly could have come from this individual. One hair also recovered
> from the afghan was noted to be consistent with the known hair of
> Kenneth Smith.
>
> None of the other questioned hairs recovered from the scene were found
> to be similar to the known hair of the suspects.

*Id*.

Based on the contention that the second Kenneth Smith referenced in the report

is Kenneth Ray Smith, Smith claims that the prosecution violated *Brady* by failing to

produce the trace evidence report and to inform him that "the known hair of Kenneth

Ray Smith was consistent with a hair on the afghan." Doc. 1 at 65. He argues, in part,

that the report was exculpatory because, "[a]ccording to the State's theory of the case

Kenneth Ray Smith had no connection to the crime or the Sennetts," and that "[t]he

presence of his hair at the crime scene could only mean that the evidence was

mishandled or contaminated, which would have been critical to Mr. Smith's defense

at every phase of the proceeding." Doc. 31 at 93. And, as to prejudice, Smith claims that if he had "known that forensic analysts had determined that a hair on the afghan was consistent with the known hair of Kenneth Ray Smith, he would have used that information affirmatively in all phases of [his]trial." *Id*. at 94.

Smith unsuccessfully raised this claim in his amended Rule 32 petition, and the Court of Criminal Appeals affirmed the trial court, finding that:

> [T]he circuit court correctly held that Smith failed to prove that Kenneth Ray Smith's hair was, in fact, on the afghan, . . . He failed to prove the origin of the trace evidence report with the handwritten notation presented to the Rule 32 court that, Smith says, was produced and then suppressed by the State, and he failed to prove who wrote on the report. Furthermore, Smith did not prove that the State suppressed any evidence, and . . . one of Smith's trial attorneys, testified by affidavit that he was shown a copy of the marked report that postconviction counsel represented to him was recently produced by the Alabama Department of Forensic Sciences. Smith continues to acknowledge several significant points in his briefs on return to remand: he does not know who made the notation on the trace evidence report, when the person made the notation and why the person made it, and he admits that the notation only "suggests" that someone at the Department of Forensic Sciences made it. . . . By his own arguments, Smith demonstrates that he has failed to prove that the State suppressed any material evidence.

> Even if Kenneth Ray Smith's hair had been found on the afghan and the State had suppressed that evidence, and we do not find either of those points to have been proven by Smith, there is no reasonable probability that the result of the trial would have been different,. . . . The presence of another person's hair would not negate Smith's participation in the crime; that participation was thoroughly established by Smith's own confession, in addition to direct and circumstantial evidence of Smith's active planning of and participation in the brutal murder-for-hire . . . .

Vol. 45, Tab 102 at 13-17(footnotes omitted). Smith disagrees with this decision –

contending that it is contrary to or an unreasonable application of *Brady* and an

unreasonable determination of the facts. Doc. 31 at 95

To prove that the state's failure to produce Kilbourn's report violated *Brady*,

Smith must show that the report was favorable to him; that it was suppressed by the

state; and that he suffered prejudice. *See Boyd*, 697 F.3d at 1334-35 (11th Cir. 2012).

Smith cannot make the prejudice showing because, even assuming that the report

indeed indicated that the hair found on the afghan belonged to Kenneth *Ray* Smith

rather than Smith and that the state suppressed the report, Smith cannot show a

"reasonable probability that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667,

682 (1985). After all, in addition to concluding that "one hair also recovered from the

afghan was noted to be consistent with the known hair of Kenneth Smith," the report

found also that hairs "similar in many characteristics to the known head hair of

Kenneth *Eugene* Smith" were found on a cap that was found at the crime scene.

Furthermore, Smith confessed to being at the crime scene and to taking part in the

crime. Thus, any evidence of the presence of a hair from Kenneth Ray Smith on the

afghan would not have negated Smith's participation in the crime. And, to the extent

that Smith is contending that the presence of Kenneth Ray Smith's hair at the victim's

home established that the state mishandled or contaminated the forensic evidence from the crime scene, this argument is unavailing because no forensic evidence was admitted at the trial.

To close, no reasonable likelihood exists that evidence that the state found a hair from Kenneth Ray Smith at the crime scene would have affected the jury's judgment. Thus, the Court of Criminal Appeals' finding that Smith failed to prove the elements of a *Brady* claim was neither contrary to, or an unreasonable application of *Brady*, nor was it based on an unreasonable determination of the facts.

**Claim D.      Whether The Trial Court's Complicity Instruction Violated Smith's Sixth, Eighth, and Fourteenth Amendment Rights by Relieving the State of its Burden to Prove That He Had a Specific Intent to Kill**

Based on Alabama law, which requires a showing of a "particularized intent to kill" for a conviction of capital murder as an accomplice, *see Ex parte Raines*, 429 So. 2d 1111, 1112 (Ala. 1982),   Smith challenges the trial court's complicity instruction. More specifically, Smith claims the court "erroneously instructed the jury that it could find [him] guilty of capital murder under a theory that effectively eliminated the State's burden to prove beyond a reasonable doubt that he had the requisite specific intent to kill." Doc. 1 at 66. This contention is unavailing because, as the Court of Criminal Appeals found, "the trial court, on more than one occasion, instructed the jury that it must find a specific or particularized intent on the

defendant's part before the jury could convict a defendant of capital murder." *Smith*, 908 So. 2d at 297. Smith argues that the state appellate court's decision is an unreasonable application of *In re Winship*, 397 U.S. 358 (1970) and *Sandstrom v. Montana*, 422 U.S. 510 (1979).[47] Doc. 31 at 104. In *Winship*, the Court held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. In *Sandstrom*, the Court held that a jury instruction violates the Due Process Clause if it relieves the state of "the burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind." 422 U.S. at 521.

When reviewing an "ambiguous" instruction, this court must examine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (internal quotation marks omitted). The standard requires courts to look at the challenged jury instruction as a whole and to avoid strained readings. *See Jones v. United States*, 527 U.S. 373, 391 (1999) ("We previously have held that instructions

---

[47] Smith also asserts that the finding is an unreasonable application of *Schad v. Arizona*, 501 U.S. 624 (1991), because the trial court effectively instructed the jury on two separate offenses and it is impossible to tell whether the jury unanimously agreed that he was guilty of one or the other. Doc. 1 at 70-72; Doc 31 at 101-03. This claim, which Smith did not present in state court, is barred from review in this court.

that might be ambiguous in the abstract can be cured when read in conjunction with other instructions.") (citations omitted). Consistent with this charge, the court has reviewed the trial court's entire instructions to the jury and is satisfied that the complicity instruction was constitutionally sufficient. In the charge, the trial court made it clear that the jury needed to find that Smith had a specific intent to kill before it could convict Smith of capital murder under any theory. Thus, the Court of Criminal Appeals' decision was not an unreasonable application of *Winship* or *Sandstrom*.

**Claim E.** **Whether The Trial Court Violated Smith's Rights under the Fourth, Fifth, and Fourteenth Amendments by Admitting His Custodial Statement, Which Was the Fruit of an Unlawful Search and Unlawful Arrest**

Smith challenges the admission of the search warrant a Lauderdale County circuit judge issued for the residence of Renea Bryant in Florence to look for a Samsung video cassette recorder, Model VT-311TQ, serial number 7020101324, stolen from the murder scene. Vol. 8 at 1599. Captain May and Lauderdale County Investigator Charles Ford found the VCR during the search. Vol. 8 at 1599 and Vol. 11 at 227-35. After finding the VCR, Captain May read Smith, who was present during the search, his *Miranda* rights and Smith agreed to accompany Captain May to the sheriff's office, Vol. 11 at 235-43, where Smith confessed to his participation

in the murder and to stealing the VCR. Vol. 23 at 297-304. Smith now contends that the state recovered the VCR through an unlawful search, and that his custodial statement was the result of an unlawful arrest. Doc. 1 at 72.

1. **Whether The Search Warrant Was Invalid Because it Was Obtained Based on Information Provided by an Anonymous Informant Who Conducted a Warrantless Search of Smith's Home as an Agent of the State**

Smith first claims that the search warrant was "procured based on information obtained by police improperly and illegally from informant '569S,' who searched Mr. Smith's home at the behest of police, when the police themselves could not lawfully enter." *Id*. at 73. Smith contends that the anonymous informant acted as an agent of the state, making her warrantless entry into his home illegal, and the warrant based on information she obtained in his home invalid. *Id*. at 75. He claims that the court should have excluded evidence of the VCR and the custodial statement obtained as a direct result of the search. *Id*.

Trial counsel raised this claim in a pretrial motion to suppress. Vol. 2 at 362-76. The trial court denied the motion. Vol. 9, Tab 6; Vol. 10, Tab 7 - Vol. 11 at 385. Counsel then raised the claim on direct appeal after Smith's conviction. Vol. 25, Tab 36 at 39-49. The Court of Criminal Appeals denied the claim on the merits, finding, based on the evidence, that the informant acted as a private individual and "of her

own free will." *Smith*, 908 So. 2d at 289. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976) (footnotes omitted). "An 'opportunity for full and fair litigation' means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes." *Caver v. State of Ala*., 577 F.2d 1188, 1192 (5th Cir. 1978). "'[F]ull and fair consideration' in the context of the Fourth Amendment includes 'at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute.'" *Bradley v. Nagle*, 212 F.3d 559, 565 (11th Cir. 2000) (quoting *Caver*, 577 F.2d at 1191).

The state trial court afforded Smith an evidentiary hearing on the motion to suppress. Vol. 9, Tab 6; Vol. 10, Tab 7. And when Smith challenged the ruling, the state appellate court issued a reasoned decision, finding that Smith's Fourth Amendment rights were not violated because the informant was acting as a private citizen. *Smith*, 908 So. 2d at 286-89. Despite this, Smith contends that he was not

provided an opportunity for full and fair litigation of this claim because the Court of

Criminal Appeals misapplied federal constitutional law in reaching its decision. Doc.

1 at 76.  But *Stone* applies even if a state court errs in its Fourth Amendment analysis.

As the Fifth Circuit held in *Swicegood v. State of Alabama*,

> If this argument [that the state denied the petitioner a fair hearing by misapplying federal constitutional law] were correct, the federal courts would consider the merits of fourth amendment habeas cases whenever the state courts erred in their fourth amendment analysis and would refuse to consider the merits of those cases in which the state courts were correct. That, of course, is federal habeas review of state court fourth amendment decisions, precisely what *Stone* forbids. If the term "fair hearing" means that the state courts must correctly apply federal constitutional law, *Stone* becomes a nullity.

577 F.2d 1322, 1324 (5th Cir. 1978).[48] Therefore, even if Smith is correct, *Stone* still

bars this court from considering his claim because he received a full and fair

opportunity to litigate this claim in state court.

### 2.    Whether The Search Exceeded the Scope of the Warrant

Smith contends also that the search leading to his statement and recovery of the

VCR exceeded the scope of the warrant because law enforcement searched his entire

home for evidence in general even though the warrant only specified the VCR.  Docs.

1 at 77-78; 31 at 108-09. Again, Smith received an opportunity to argue this claim in

---

[48]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the Fifth Circuit decided before October 1, 1981.

the hearing on his motion to suppress, Vol. 9, Tab 6; Vol. 10, Tab 7, and on direct appeal, where the Court of Criminal Appeals found that the "police did not exceed the scope of the warrant." *Smith*, 908 So. 2d at 289.[49] Put simply, the state courts fully and fairly considered this claim. Therefore, because Smith received a full and fair opportunity to litigate this claim in state court, *Stone* precludes this court from reviewing the state court's decision.

### 3.    Whether Smith's Custodial Statement Resulted from an Unlawful Arrest in Lauderdale County by a Colbert County Law Enforcement Officer Outside His Jurisdiction

Finally, Smith asserts that the trial court should have suppressed his statement because it resulted from an illegal unlawful arrest in Lauderdale County by a Colbert County law enforcement officer, in violation of Ala. Code §§ 15-10-1[50] and 15-10-70.

---

[49]In issuing this finding, the state appellate court noted, in part, that:

The record reflects that, when executing the search warrant, officers entered the home and did an initial security search to determine the location of its occupants. May testified that the VCR was recovered within 10 minutes after the search began. Police did open several drawers in the home. Immediately upon recovering the VCR police discontinued their search. The VCR was the only item taken during the search.

*Smith*, 908 So. 2d at 289.

[50] Ala. Code § 15-10-1 provides:

An arrest may be made, under a warrant or without a warrant, by any sheriff or other officer acting as sheriff or his deputy, or by any constable, acting within their respective counties, or by any marshal, deputy marshal or policeman of any incorporated city or town within the limits of the county.

Docs. 1 at 78-82; 31 at 109-11. Again, Smith received a hearing on his motion to suppress his custodial statement. Vol. 9, Tab 6; Vol. 10, Tab 7. And, the Court of Criminal Appeals also rejected his claim finding that Sec. 15-10-70 "has no application to the arrest in this case because Smith was arrested by officers from the county where the crime occurred," and that officers from Smith's own county were also involved in the search which was the result of a search warrant issued by a judge in Lauderdale County. *Smith*, 908 So. 2d at 291-92. The court found also that "§ 15-10-1 has been superceded by the adoption of Rule 3.3 [of Ala. R. Crim. P]," which "provides that '[t]he arrest warrant shall be directed to and may be executed by any law enforcement officer within the State of Alabama,'" and "effectively did away with the requirement that an official may make a legal arrest only in the county or municipality in which the officer is employed." *Id.* Therefore, because the state courts afforded Smith an opportunity, even if Smith is correct that the Court of Criminal Appeals applied "an incorrect legal standard" in denying this claim, *Stone* still applies and bars this court from reviewing the state court's decision. *Swicegood*, 577 F.2d at 1324.

**Claim F.    Whether The Trial Court's Violated Smith's Rights under the Sixth and Fourteenth Amendments by Admitting Evidence about Charles Sennett's Suicide**

The prosecution's theory at trial was that the victim's husband, Charles Sennett, hired Smith and two other men to kill his wife. Vol. 14, Tab 14 at 526. During the opening, the prosecution mentioned that Mr. Sennett "took his own life by shooting himself in the chest" a week after the murder. Vol. 15 at 536. Defense counsel objected, in part, on prejudice,[51] and argued also that reference to the suicide was the "most powerful consciousness of guilt that could possibly be." *Id*. at 538. The prosecution countered that it would offer evidence of the suicide only to "address the question of where is Charles Sennett," why he would not testify at the trial, and not as an inference of Smith's guilt. *Id*. at 537-38. As a result, the trial court overruled Smith's objection. *Id*. at 538.  Counsel objected again when Captain May testified

---

[51] The full objection stated:
I object to the reference to the Reverend Sennett's suicide, self-inflicted gun shot wound pursuant to the Fifth, Sixth, Eights and Fourteenth Amendments, Section 6 of the Alabama Constitution and the Alabama Rules of Evidence. That was an assertive act. It was not to convey facts. It makes a statement. It was not committed in the course or pursuant to any conspiracy. There is no way I can cross examine those inferences of guilt and either for [sic] object to any reference to this event that has no probative value with respect to the charged offense in the indictment. It has absolutely no link to my client's ability or state of mind and it's highly prejudicial. I would also like the record to reflect a continuing objection to the introduction of any evidence – obviously now the horse is out of the barn and it is too late to shut the door.

Vol. 14, Tab 14 at 536-37.

during the trial that he last saw Mr. Sennett after Mr. Sennett had shot himself at his

son's home, and that Mr. Sennett subsequently died at the hospital. *Id*. at 681-82.

Smith argues that Captain May's testimony was inadmissible hearsay because

it was "nonverbal conduct asserting Mr. Sennett's guilt in planning the murder of his

wife," doc. 1 at 83, and that the admission of this testimony violated the

Confrontation Clause, *id*. at 111-13. To the extent Smith is arguing that testimony

concerning the suicide of Mr. Sennett was inadmissible hearsay, "it is not the

province of a federal habeas court to reexamine state-court determinations on

state-law questions. In conducting habeas review, a federal court is limited to

deciding whether a conviction violated the Constitution, laws, or treaties of the

United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Rather, "federal courts

my intervene in the state judicial process only to correct wrongs of a constitutional

dimension." *Wainwright v. Goode*, 464 U.S. 78, 83 (1983). Because this claim is not

cognizable on habeas review, it is due to be denied.

To show the requisite constitutional dimension, Smith argues that the trial

court's admission of this testimony violated his right to confrontation under *Crawford*

*v. Washington*, 124 S. Ct. 1354 (2005) and *Bruton v. United States*, 391 U.S. 123

(1968). Doc. 31 at 111-13.[52] Smith contends that the Court of Criminal Appeals'

resolution of this issue is contrary to or an unreasonable application of *Bruton*. Doc.

31 at 113.[53] Specifically, he argues that Mr. Sennett's suicide was "nonverbal conduct

asserting his guilt in planning his wife's murder," *id*. at 112, and that "because Mr.

Smith allegedly had been hired by Mr. Sennett, the jury could infer Mr. Smith's guilt

---

[52]In *Bruton*, the Supreme Court held that the trial court's admission of a co-defendant's confession implicating the defendant in a joint trial violated the defendant's right of cross-examination under the Confrontation Clause of the Sixth Amendment. *Bruton*, 391 U.S. at 131, 136-37. In *Crawford*, the Court held that the Confrontation Clause permits "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. 36 at 52.

[53]In denying this claim on direct appeal, the Alabama Court of Criminal Appeals held: However, evidence of Sennett's suicide was not hearsay. "Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." *Bryant v. State*, [Ms. CR–98–0023, November 19, 1999] – So. 2d –, – (Ala. Crim. App. 1999), quoting *James v. State*, 723 So. 2d 776, 779 (Ala.Crim.App.), *cert. denied*, 723 So. 2d 786 (Ala. 1998).

Without considering other aspects of hearsay, evidence of Charles Sennett's suicide was not offered for the truth of the matter asserted. The State argued at trial that it was offering this evidence to explain Charles Sennett's absence in the investigation and trial. Smith further admits in his brief that there are many reasons why someone might commit suicide and there were several possible explanations in this case.

Moreover, Smith has failed to show any prejudice. Smith argued that evidence of the suicide tended to show his guilt and therefore should not have been admitted at trial. Smith's attorney, in opening statement, devoted much of his remarks to discussing Sennett's guilt and the fact that he had a particularized intent to kill his wife. Smith admitted Charles Sennett's participation in the murder for hire. Based on the record here, admitting evidence of Sennett's suicide did not amount to reversible error. *See Richardson v. State*, 690 S.W.2d 22 (Tex. App. 1985).

*Smith*, 908 So. 2d at 293.

from Mr. Sennett's suicide," and that he "had no opportunity to cross-examine [Mr. Sennett]." *Id*. at 113. This argument is unavailing because, in the absence of any evidence as to why Mr. Sennett killed himself, Smith cannot establish that Mr. Sennett's suicide was "nonverbal conduct asserting [Smith's] guilt." *See United States v. Goodman*, 605 F.2d 870, 883 (5th Cir. 1979) ("Appellants' claim that Herbert Goodman's suicide is tantamount to a confession is unfounded in the absence of any evidence of why he committed such an act."). And, Smith's "argument that [Mr. Sennett's] suicide deprived [Smith] of [his] right to confront witnesses [was] unfounded, because there was no showing that [Mr. Sennett] would have taken the stand to testify" if he were alive. *Id.*

Moreover, even assuming that Mr. Sennett's suicide amounted to a confession and deprived Smith of the right to cross-examine him, Smith is entitled to no relief. *Bruton* excludes "only those statements by a non-testifying defendant which directly inculpate a co-defendant." *United States v. Beale*, 921 F.2d 1412, 1425 (11th Cir. 1991). "[A]dmission of a codefendant's statement is not error under *Bruton* where the statement 'was not incriminating on its face, and became so only when linked with evidence introduced later at trial.'" *United States v. Joyner*, 899 F.3d 1199, 1207 (11th Cir. 2018) (quoting *United States v. Arias*, 984 F.2d 1139, 1142 (11th Cir. 1993). Thus, for *Bruton* to apply, Mr. Sennett's suicide must be "clearly inculpatory

standing alone." *Id.* (quoting *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984), *cert. denied*, 471 U.S. 1117 (1985). Smith has failed to make this showing, and consequently the Court of Criminal Appeals' denial of this claim was neither contrary to, nor an unreasonable application of *Bruton*.

Likewise, Smith's claim that the Court of Criminal Appeals' resolution of this issue was based on an unreasonable determination of the facts also fails. Doc. 31 at 113. Smith challenges the portion of the court's opinion that "Smith was not prejudiced by the admission of evidence of Mr. Sennett's suicide because 'Smith's attorney, in opening statement, devoted much of his remarks to discussing Sennett's guilt and the fact that he had a particularized intent to kill his wife' and 'Smith admitted Charles Sennett's participation in the murder for hire.'" *Id.* He argues that this finding was unreasonable because:

> Mr. Smith's attorney told the jury that Mr. Smith "agreed with Sennett to go beat Elizabeth Dorlene Sennett, to rough her up, to make it look like a robbery for fast cash," and "with respect to Mr. Smith the terms, the terms never changed." Vol. 15, Tab R-15 at 548. The critical issue was not Mr. Sennett's intent; it was Mr. Smith's. And the admission of evidence of Charles Sennett's suicide absent the opportunity to cross-examine him about the plan originally posed to Billy Williams and through him, to Mr. Smith, prejudiced Mr. Smith.

*Id.* at 114.

Title 28 U.S.C. § 2254(d)(2) allows habeas petitioners to avoid the bar to habeas relief on claims adjudicated on the merits by showing that the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." However, "[i]t does not repeal the command of § 2254(a) that habeas relief may be afforded to a state prisoner 'only on the ground' that his custody violates federal law." *Wilson v. Corcoran*, 562 U.S. 1, 6 (2010). Because the admission of testimony about Mr. Sennett's suicide does not violate federal law, Smith is not entitled to habeas relief on this claim even assuming that the trial court's findings of fact on this issue were unreasonable.

**Claim G.     Whether Alabama's Method of Execution Constitutes Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments**

Smith alleges that Alabama's lethal injection protocol unconstitutionally "inflicts unnecessary pain on people on whom it is imposed." Doc. 1 at 87. Allegedly, injection of the second and third drugs used in Alabama's three-drug protocol is "excruciatingly painful," and that if the first drug in the protocol does not render the inmate unconscious, "administration of the combination of the second and third drugs paralyzes the inmate and forces him to experience the excruciating pain of his own agonizing death while rendering him unable to express his pain by any means." *Id*. at 85. This claim is not cognizable in this habeas corpus case:"[f]ederal habeas

corpus law exists to provide a prisoner an avenue to attack the fact or duration of physical imprisonment and to obtain immediate or speedier release." *Valle v. Sec'y, Fla. Dep't of Corr*., 654 F.3d 1266, 1267 (11th Cir. 2011). In contrast, a death row inmate's challenge to the state's method of execution attacks "the means by which the state intends to execute him, which is a circumstance of his confinement." *McNabb v. Comm'r, Ala. Dep't of Corr*., 727 F.3d 1334, 1344 (11th Cir. 2013). "For that reason, '[a] § 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures.'" *Id*. (quoting *Tompkins v. Sec'y, Dep't of Corr*., 557 F.3d 1257, 1261 (11th Cir. 2009). *See also Glossip v. Gross*, 135 S. Ct. 2726, 2738 (2015) ("[A] method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence.") (citing *Hill v. McDonough*, 547 U.S. 573, 576 (2006)). Because this claim is not cognizable in a federal habeas corpus action, it is due to be denied.

## VI.  CONCLUSION

For all these reasons, and after careful review, the court concludes that Smith's petition, doc. 1, and his motion for an evidentiary hearing, doc. 32, are due to be denied. A separate order will be entered.

DONE and ORDERED this <u>12th</u> day of September, 2019.

_____
ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE